# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF MINNESOTA.

---

## STATE v. ROLAND HENRIONNET.[1]

### February 7, 1919.

### No. 21,098.

**Criminal law — appeal and error — when exclusion of evidence is prejudicial.**

1. The rule that, to render the exclusion of evidence on the trial of an action prejudicial error, the relevancy and materiality thereof to the issues involved must affirmatively appear, applies to criminal prosecutions as well as civil actions.

**Same — homicide — objection to question sustained.**

2. Defendant shot and killed the person named in the indictment, and when on the witness stand in his own behalf was asked by his counsel to state what was said by decedent immediately preceding the shooting; a ruling sustaining an objection to the question *held* not error, since the character or relevancy of the evidence was not disclosed.

**Same — whether statute making conversations with decedent incompetent applies.**

3. It is doubtful whether section 8378, G. S. 1913, prohibiting evidence of conversations with deceased or insane persons, by a party or person interested in the result of the action, has any proper application to criminal prosecutions. Whether it does apply, quaere?

**Same — refusal of request to submit question to jury.**

4. The evidence does not bring the case within the first degree of

[1] Reported in 170 N. W. 699.

1—Vol. 142 M.

manslaughter, and there was no error in the refusal of the request of defendant to submit the question to the jury.

**Same — verdict sustained by evidence — new trial.**

5. The record presents no reversible error, the evidence fully supports the verdict of murder in the second degree and defendant's motion for a new trial was properly denied.

Defendant was indicted by the grand jury of Beltrami county charged with the crime of murder in the first degree, tried in the district court for that county before Stanton, J., and a jury which found defendant guilty of murder in the second degree. From an order denying his motion for a new trial, defendant appealed. Affirmed.

*M. J. Daly, Henry Funkley* and *Douglas, Kennedy & Kennedy,* for appellant.

*Clifford L. Hilton,* Attorney General, *James E. Markham,* Assistant Attorney General, and *Graham M. Torrance,* County Attorney, for the State.

BROWN, C. J.

Defendant was convicted in the district court of Beltrami county of the crime of murder in the second degree and appealed from an order denying a new trial.

Defendant shot one Oscar Nelson with a 32-calibre revolver, inflicting a wound from which death resulted three days later. Of this there is no controversy in the case. The defense on the trial below in point of substance was that the shooting was not the conscious act of defendant; that by reason of the facts presently to be stated he was mentally irresponsible and therefore not criminally liable for his act. While there was a request to submit to the jury the question of manslaughter in the first degree, as well as the two degrees of murder, a matter to be referred to later, the chief contention was the alleged unsoundness of defendant's mind at the time the fatal shot was fired. Our examination of the evidence leads to the conclusion that the shooting of Nelson was the rational and intentional act of defendant, though perhaps not premeditated, and that no legal excuse or justification was shown, nor facts rendering applicable the crime of manslaughter in the first degree. And unless error was

committed on the trial, to the substantial prejudice of defendant, the verdict of the jury must stand, and the judgment pronounced thereon by the trial court affirmed. We come then directly to a consideration of the rulings of which defendant complains.

The assignments of error present three questions, namely: (1) Whether the court erred in not permitting defendant to give in evidence a conversation had by him with Nelson immediately preceding the shooting. (2) Whether the court erred in refusing to submit to the jury the question of manslaughter in the first degree. (3) Whether there was error in the exclusion of certain evidence tendered by defendant, the nature and character of which will be stated in its order.

1. A statement of some of the facts is necessary to an understanding of the questions so presented. Defendant is a married man, and for some years past has resided with his wife and child at Bemidji; the child was about two years of age at the time of the unfortunate occurrence here involved. Defendant had known Nelson for several years, and they had been intimate friends and companions; Nelson being also a resident of Bemidji and an employee in one of the local banks. Defendant is about 25 years of age and to some extent afflicted with tuberculosis, and for two or three months preceding the shooting had been at a hospital or sanatorium some 16 miles north of Bemidji where tubercular patients were received and treated. Defendant's wife became an assistant to the hospital nurses and roomed at the institution with a nurse named Humphner.

The homicide occurred at about 11 o'clock on the forenoon of November 15, 1917, and arose out of a belief on defendant's part that Nelson had sustained improper relations with defendant's wife two days before at Bemidji. Information to that effect came to defendant at the sanatorium late in the evening of the preceding day under the following circumstances, stated without unnecessary detail. At about 11 o'clock at night defendant was in what is described in the record as the "guest room" of the hospital, in which the nurse heretofore referred to had retired for the night. On hearing some one approaching defendant locked the door leading to the room and passed out onto the porch where he attempted to conceal himself. The person approaching the room was his wife, and upon a knock at the door the nurse arose and turned the

lock and permitted her to enter the room. She immediately demanded to know where her husband was, at the same time accusing the nurse of misconduct with him. This brought from the nurse a counter charge of improper relations between the wife and Nelson the preceding day at Bemidji, and an exclamation from the wife, uttered as though startled or alarmed by the thought, to the effect that she had left Nelson's handkerchief under the mattress in the room she occupied at the hotel in Bemidji at that time. Defendant presently came into the room from his place of concealment on the porch and joined in the controversy, sham or real, then under way. The talk back and forth satisfied him that the charge made by the nurse against his wife was true, and that conclusion was confirmed in defendant's mind by the wife's exclamation about the Nelson handkerchief, which he overheard, though the record discloses no other act of misconduct with Nelson. The quarrel continued until the arrival of the head nurse, when all parties repaired to their respective quarters.

It may be said in passing that defendant, in accounting for his presence in the guest room and his act in locking the door on hearing the approach of footsteps, stated that he was there in response to a request from his wife to meet her at that time, and he supposed that she had preceded him to the room. It is probable, as suggested by counsel for defendant, that the meeting of the parties in the guest room, as just related, was planned by defendant's wife with the co-operation of the nurse, for the purpose of putting defendant in a compromising position. It is also probable that the charge then made against the wife, though in a measure acquiesced in by her, was not in fact true, and that it was made and so acquiesced in for some purpose not disclosed by the evidence, unless found in an intimation thrown out by the testimony of the head nurse that the wife was desirous of getting a divorce from defendant. But we do not dispose of the case on the theory that the guest room meeting was prearranged for the suggested purpose, or that the wife was planning for a divorce suit, but rather from the viewpoint of defendant and his belief that the charge against her was true. He has the right to have the case considered in the light which he claims prompted his subsequent conduct. We so consider it.

Defendant soon after the disclosure referred to stated to his wife that

he intended to go to Bemidji the next morning for the purpose of investigating the matter, especially of attempting to get the Nelson handkerchief which she said had been left at the hotel. Accordingly on the following morning, the day of the homicide, he took the train for Bemidji, arriving at about 10 o'clock. Before starting out he telephoned his mother at Bemidji concerning the matter, and requested her to get the chief of police and go to the hotel in search of the Nelson handkerchief. On the arrival of the train at Bemidji, defendant's mother and his uncle met him, and in an excited way he stated to them that he "had the goods" on Nelson and his wife, and intended to make Nelson enlist. Upon inquiry whether his mother had gone to the hotel in search of the handkerchief, she informed him that she had not and did not intend to go. She counselled moderation by defendant, and that he do nothing to bring notoriety and disgrace upon the family. They walked to the mother's store where the advice was repeated, and to the mother and uncle defendant seemed calm and not unduly excited or disturbed, and both believed that no serious trouble would follow. The conference was not long, and when the mother started to wait on a customer defendant stated that he would go and consult his doctor as he was not feeling well. He left the store and proceeded immediately to a nearby hardware dealer, where he purchased a 32-calibre revolver and a box of cartridges. From the hardware dealer he went directly to the home of the mother, about a block from her store, where he loaded the revolver and returned to the street. He did not call upon his doctor, nor did he make any effort to find the handkerchief at the hotel, and it was not then nor at any other time found in the hotel room or elsewhere; at least the evidence is entirely silent on the subject. Defendant denied that he had any intention of shooting Nelson when he bought the revolver, and explained the purchase on the theory that he intended to use it in target shooting on his return to the hospital. The good faith of that claim was for the jury.

We again digress to say that defendant's wife accompanied by the head nurse preceded defendant to Bemidji by automobile, arriving some little time in advance of the train on which defendant made the trip. What reason or purpose the wife and the nurse had in view is not satisfactorily explained by the evidence. The wife was not a witness on the trial, and the nurse who was did not disclose the particular purpose. It is prob-

able that the mission of the wife was in part to advise Nelson of the situation. At any rate such was defendant's view of the matter.

After loading the revolver, as just stated, defendant walked one block east from his mother's residence and thence down the street toward the bank in which Nelson was an employee. When within 150 feet of the bank building, defendant noticed his wife and the nurse leaving a candy store followed closely by Nelson. The women walked briskly down the street and did not notice the presence of defendant. Defendant "slowed down" his pace to see whether Nelson intended to overtake the women. And on noticing that he did not so intend defendant hurried forward and joined him. Defendant testified that Nelson spoke to him in the usual way, and a bystander who witnessed the meeting testified that Nelson took defendant's arm and smiled as they walked along together. They walked past the entrance to the bank building and to a stairway leading to offices over the bank and adjoining building, one of which was occupied by the Federal recruiting officer, authorized to accept enlistments in the army. As they entered that stairway, the door closing behind them, the shooting immediately occurred, or, as defendant testified, when they were part way up the stairs.

We here reach the first contention of defendant above referred to, namely, that the court erred in excluding evidence of the conversation between Nelson and defendant during the time they were together immediately preceding the shooting. The ruling came about in the following manner: Defendant was a witness in his own behalf, and during the course of his direct examination his counsel asked the question whether he could recall what Nelson said on that occasion. Whereupon the county attorney interrupted with: "Just a moment." This brought from counsel for defendant the inquiry and statement: "Do you propose to interpose an objection? I suppose this question is preliminary. I do not care to go any further." The court permitted the question to be answered by yes or no, and the witness responded in the affirmative. His counsel then said: "Oh, I think I will ask the other question, if the court please. What was said?" The county attorney objected on the ground that the conversation was had with a deceased party and therefore inadmissible under the statute prohibiting giving in evidence such conversations by a party or person interested in the result of an action.

Defendant's attorney then said to the court: "I do not think it necessary to discuss it. If the state did not object, it was admissible. If it does object it is not admissible." The court concurred in that view and sustained the objection. No exception was taken to the ruling at the time, and no offer was made to show the subject matter of the conversation, or the relevancy thereof to the issues in the case, counsel evidently being of the opinion that the ruling of the court was right. The contention now made, by new counsel, is that the statute prohibiting giving in evidence conversations with a deceased party or person (section 8378, G. S. 1913), has no application to criminal prosecutions, that the conversation was admissible as part of the res gestae, and therefore that the ruling of the court was prejudicial error.

It may be doubted whether our statute which prohibits giving in evidence conversations with deceased persons has any application to criminal prosecutions. As originally enacted, and as it appears in the statutory revision of 1866, it clearly was limited to civil controversies arising out of contract. Section 8, c. 73, G. S. 1866. The subsequent amendment of the statute by a rearrangement and reduction of its language (chapter 40, p. 72, Laws 1877), within the rule guiding the construction of such amendments, does not indicate a purpose on the part of the legislature of enlarging its application. Duluth Terminal Ry. Co. v. City of Duluth, 113 Minn. 459, 130 N. W. 18; Dunnell, Minn. Dig. 1916 Supp. § 8961. So that in its amended form it probably means nothing more than as originally enacted. In fact so far as our information extends the statute has not heretofore been understood as applicable to criminal proceedings. It was before the court in State v. Eisele, 37 Minn. 256, 33 N. W. 785, a prosecution for the unlawful obstruction of a highway, but the precise point here involved was not there raised. Such statutes are not made applicable to criminal prosecutions in other states. 4 Jones, Blue Book of Evidence, § 772; 12 Enc. Ev. 702. But conceding for the purposes of the case that the statute does not apply to criminal prosecutions, and that the conversation between defendant and Nelson was admissible as a part of the res gestae, the ruling of the court excluding it presents no error of which defendant may complain. If by assuming and stating to the trial court that the evidence was inadmissible if the state objected, counsel for defendant did not invite the ruling

now complained of (1 Dunnell, Minn. Dig. § 419), the subject matter of the conversation was not shown to have any relevancy to the issues on trial. Counsel for defendant undoubtedly knew to what it related, the purport and effect thereof, and whether it was material to the defense and should in some way have disclosed the same to the court. This he did not do and the court was not otherwise advised upon the subject. The exclusion of the conversation was not therefore reversible error. The rule that the materiality of proffered evidence must be shown to render the exclusion thereof error is well settled in this state, and applies to criminal prosecutions as well as civil actions. State v. Herrick, 12 Minn. 75 (132); State v. Scott, 41 Minn. 365, 43 N. W. 62; State v. Nelson, 91 Minn. 143, 97 N. W. 652; Thaden v. Bagan, 139 Minn. 46, 165 N. W. 864; Wilson v. State, 128 Ala. 17, 29 South. 569. Defendant is not shown to have been prejudiced by the ruling.

2. There was no error in the refusal of the court to submit to the jury the question of manslaughter in the first degree. Though defendant requested the submission of that issue, the defense relied upon, as disclosed by the evidence and the course of the trial, was that the fatal shot was fired at a moment when he was mentally deranged and irresponsible. The court so instructed the jury, to which no objection was made, save the one general exception to the refusal of several requests for instructions, which included that of manslaughter. From the viewpoint of defendant's testimony, construed most favorably in the light of the contention now made, the shooting was not the result of passion, aroused by sudden combat or other provocation arising from the conduct of Nelson. Nothing of the kind was intimated by him in giving his testimony to the jury. On the other hand, the whole labor of the defense was to convince the jury that, after the parties had entered the stairway leading to the office of the government recruiting agent, Nelson suddenly turned and pushed defendant, causing his head to strike the wall of the building, from which moment all went black or blank to defendant, and he had no recollection of what subsequently occurred. The case as thus presented was wholly inapplicable to manslaughter in the first degree, and the court therefore was not required to submit the question to the jury. The facts in this respect are substantially similar to those disclosed in the case of State v. Corrivau, 93 Minn. 38, 100 N. W. 638. See also

State v. Towers, 106 Minn. 105, 118 N. W. 361; State v. Smith, 56 Minn. 78, 57 N. W. 325; State v. Hanley, 34 Minn. 430, 26 N. W. 397.

An affidavit made the basis of his motion for a new trial presents the case in an entirely different light, and flatly inconsistent with the record as made at the trial. Defendant chose as a defense a suddenly deranged mind, rendering him unconscious of his acts, and by that his case must be tested in this court. And, moreover, the evidence in our view of the record is overwhelming that he fired the fatal shots at Nelson with the intention to kill, thus taking the case entirely out of the range of manslaughter in the first degree. So far as appears by the record Nelson was unarmed. He was about the same age and the same stature as defendant, though a little heavier. He was being urged on by defendant, so defendant claims, to the office of the recruiting officer. If defendant's claim in this respect be true, and we have no reason for doubting it, then it seems clear that Nelson suddenly concluded that he would go no further, and in turning back undoubtedly brushed against defendant on the stairway. Thereupon defendant fired five shots at his victim; one took effect in the back of Nelson's neck, burning his clothing at the point where the bullet entered; one took effect in the abdomen, also burning the clothing, one upon his wrist, and two shots failed of their mark. Nelson came running out of the stairway onto the street followed by defendant with the revolver still pointed toward him. Defendant was immediately questioned by those who had been attracted to the spot by the shooting, and, in response to the inquiry why he shot Nelson, indulged in much vulgarity and profanity, saying that he intended to make Nelson enlist, but before reaching the recruiting office made up his mind that he would be no good to his country and concluded to kill him. He was of course somewhat excited at the time, but those who were present at the time observed nothing to indicate an unbalanced or deranged mind. He was rational enough when the officer came to arrest him a few minutes later to request that he be taken to the hotel for the purpose of finding the handkerchief his wife had said she left there. There was no suggestion at the trial that anything occurred after the parties reached the stairway to in anyway disturb him, except the claim that when Nelson attempted to push or shove him aside his head violently struck the wall, causing an immediate loss of his senses, which

continued until he realized his situation in the county jail several hours later. The new theory first made in the affidavit supporting the motion for a new trial comes too late. The record made at the trial cannot thus be supplemented or enlarged. State v. Durnam, 73 Minn. 150, 75 N. W. 1127. Surely defendant cannot be permitted to play fast and loose with the facts, even though his liberty is at stake. The evidence points unerringly to intentional homicide.

3. The defendant called as a witness in his behalf one of the clerks of the hotel where his wife took lodgings at the time heretofore referred to and offered to show that she was assigned to room 62, and that later Nelson registered for lodgings and was assigned to room 22. The evidence was excluded and the ruling is assigned as error. The evidence might without error have been admitted, but the exclusion thereof was not prejudicial to defendant. The facts were established by other evidence and were not in dispute.

This covers the case and all that need be said in disposing of the points made in support of the appeal. The evidence fully supports the verdict and we find from the record no error to justify interference by this court.

Order affirmed.