## STATE v. ABE GLEEMAN AND ANOTHER.[1]

February 11, 1927.

No. 25,647.

**Conviction for murder sustained.**

1. The evidence sustains the verdict of the jury finding the defendants guilty of murder in the first degree.

**New evidence did not require new trial.**

2. The defendants claim that they testified falsely .on the trial, and they offer to produce evidence tending to show that they are not guilty. Their showing did not require the granting of a new trial upon the ground of newly discovered evidence.

**Fraud or misconduct of counsel did not require new trial.**

3. The court did not err in denying the defendants' motion. for a new trial upon the ground of the misconduct or fraud of one of their counsel.

Criminal Law, 16 C. J. p. 1145 n. 37, 50 New; p. 1182 n. 88; p. 1183 n. 18, 19; p. 1206 n. 94; 17 C. J. p. 248 n. 3; p. 250 n. 9; p. 252 n. 17. Homicide, 30 C. J. p. 312 n. 42.

Defendants appealed from orders of the district court for Ramsey county, R. D. O'Brien, J., denying their motions for a new trial. Affirmed.

*Morphy, Bradford, Cummins, Cummins & Lipschultz,* for appellants.

*Clifford L. Hilton,* Attorney General, *James E. Markham,* Deputy Attorney General, *Harry H. Peterson,* County Attorney, and *Charles L. Hayes,* Assistant County Attorney, for. the state.

DIBELL, J.

On April 18, 1925, the defendants Abe Gleeman and Ben Gleeman, indicted with John Doe, were convicted of murder in the first degree for the killing of Burton Stevens on February 16, 1925, and were sentenced to imprisonment for life. On a ,former trial there was a

[1]Reported in 212 N. W. 203.

disagreement. After conviction they moved for a new trial upon the ground of insufficiency of evidence to sustain the verdict, errors at the trial, and newly discovered evidence. This motion was denied on November 24, 1925. Later, upon leave had, they moved for a further hearing upon an additional showing. Their motion was denied on March 31, 1926. From the orders denying these motions they appeal. In our brief outline of the case it should be understood that we usually state the claims of the parties, in support of which there is evidence, and not necessarily the proved facts.

1. On February 16, 1925, shortly after one in the afternoon, Burton Stevens was shot and killed at the corner entrance of the Dreis drug store at the southwest corner of St. Peter and Ninth streets in St. Paul. Ninth street runs east and west and St. Peter north and south. The state's claim is that just prior to the shooting a Hudson touring car was driven from the north on St. Peter street and turned into Ninth street across from the drug store; that it stopped for a moment; that the two Gleemans got out; that they went across Ninth to the corner of the drug store where Stevens was standing; that the term hijacker was applied to him; that they shot him; and that they then ran west on Ninth street and got into the Hudson car which had proceeded westerly, and disappeared.

There is evidence that shortly before the killing Stevens talked from the Dreis drug store over the telephone, apparently with Ben, suggesting a meeting. There is evidence that on the Friday or Saturday before the killing Abe was at the garage where Stevens kept his auto, inquiring for him. Stevens was not there. Abe said that he had been trying to get him over the phone, and at his flat, that he was a hard man to get, but that he would get him yet, at the same time applying an opprobrious epithet to him. This is the testimony of a witness who, so far as appears, is worthy of credit. Its value depends upon the identification of Abe, the witness not having seen him before.

Ben and Abe are brothers. Ben was 23; Abe 21. Ben admitted that he was present at the shooting. He denied that Abe was there. His testimony is that on the morning of the 16th he came down town

about 8 o'clock and went to a garage on Eighth street between Jackson and Sibley where his auto was undergoing repairs; that the repairs were not completed; that he telephoned to Abe, who lived on the west side, and that he came down with his auto. The two rode around town and out into the country in the vicinity of Como park. There is evidence that Abe was tubercular and was advised to keep in the open air. There was no business purpose in the ride. Ben claims that when on Seventh near Jackson he met Stevens and one LaSalle in an auto. He talked for a moment with LaSalle who wanted to sell him liquor. Upon their return from the country Ben and Abe stopped for a few moments at the Dreis drug store, and from there drove to the Eighth street garage, where they parted. Ben took his auto, the repairs having been finished, drove to St. Peter street, and parked facing south between Ninth and Tenth streets. This was in the block north of the drug store. From there he walked southerly toward Seventh street and at the Dreis corner met Stevens who asked him if he was in line for liquor. As they were talking two men came along, turned him around, called Stevens a hijacker, and one said to him: "You won't hijack my stuff any more." The shooting commenced. Ben saw the men at close range, and was able to describe them and their dress. He had not seen them before. He returned to his auto and drove to Minneapolis where he had an appointment. He sought Abe Ginsberg, his attorney at the two trials, but did not find him until Tuesday afternoon. He met him again on Wednesday, came with him to St. Paul, and surrendered to the police. He knew they wanted him.

The testimony of Abe about their movements on the morning of the 16th is about the same, though he did not see Stevens, and he testifies that he did not know him. After he and Ben drove from the Dreis drug store to the Eighth street garage he went to his home on the west side and was not at the shooting. Later he heard about it and tried to find Ben. Toward evening he went to Minneapolis, stayed at the house of a cousin until late in the night, and then returned to St. Paul and stopped at the home of his sister. Tuesday he was sick. On Wednesday night he went home. There he first

found that the police wanted him and went to headquarters and surrendered.

The shooting and Abe's appearance on the west side were close in point of time. There is nothing in the character of the evidence requiring the acceptance of the claim of Abe or the testimony of his witnesses that he was about home at the time of the killing. The evidence against Ben was the stronger. Both, however, were identified as the ones who did the killing. We do not try facts on appeal. We are concerned with the legal sufficiency of the evidence to sustain the verdict. The issue was for the jury. It might have found either way against both, or against Ben and in favor of Abe. A verdict for Ben and against Abe would have been a strange one, hardly a possible one.

2. The ground of newly discovered evidence is urgently pressed.

The Gleemans claim that there existed in the Twin Cities an association known as the syndicate engaged in the illegal traffic in liquor. To this syndicate Ben Gleeman, Abe Ginsberg, Morrie Miller, and Tommie Webber, the latter two being gunmen, and others not necessary to name, are said to have belonged. There was an office in St. Paul and one in Minneapolis. Each member had a definite percentage of the profits. Abe Gleeman, they say, did not belong. He was working on his own account and purchased from the syndicate.

Stevens and LaSalle were hijackers and appropriated the alcohol of the syndicate. It is of course apparent that the syndicate could have no effective aid of the law against such depredations. There was nothing for them but self-help. Morrie Miller and Tommie Webber were employed for protection against the activities of the hijackers. There had been trouble shortly prior to February 16, 1925, over a carload of alcohol in the railroad yards belonging to the syndicate. Ben states that on this occasion Morrie Miller and Tommie Webber "did then and there undertake to shoot and kill said Burton Stevens, but were restrained from doing so by the members of said syndicate;" and that he "believes that said Morrie Miller would on said occasion have killed Burton Stevens if he had not been restrained from doing so by the members of said syndicate."

Early in the morning of February 16, Ben with George Hurley went to Minneapolis and returned with a truckload of liquor. It was taken to the Eighth street garage. They were trailed on their way. After putting the liquor in the garage they sought to ascertain who had been trailing them, and in searching for them rode about in Abe's car. At Seventh and Jackson streets they found Stevens and LaSalle in the car which had been trailing. Ben said to them: "I have some stuff in the garage, don't touch it." Then he and Abe drove out in the country for the purpose of finding a place to plant the liquor. On their return they stopped at the Dreis drug store, and then drove to the Eighth street garage. Abe drove away.

Ben then went to the office of the syndicate where he found Morrie Miller, Louis Roisner, Harry Bernstein and others. He told them about meeting Stevens and LaSalle. During the talk Morrie Miller said: "They should have let me kill Stevens when he was at the depot." Some time after Ben and Morrie Miller drove to the residence of a hijacker to warn him not to touch the liquor in the garage. They returned to the office, and while Roisner and Bernstein and Morrie Miller were present Ben received a telephone call from Stevens, who said: "I heard a couple of Jews are looking for me." Ben said: "I am not looking for you. I just saw you this morning." Stevens then said: "Well, words don't mean anything on the telephone, come on over and see me." Ben asked him where he was and he said: "I am at the Dreis drug store." Ben said: "All right, I will be over in a little while." Ben told those in the office what Stevens had said. Then Morrie Miller said: "Let's go and see him." Ben said: "All right." Morrie Miller and Ben then went to the Eighth street garage, met Hurley, got into Ben's car, and drove to the Central garage on Exchange street in the vicinity of the Dreis drug store. Ben wanted Hurley to go along because "I knew that Morrie Miller had threatened to kill Stevens on a previous occasion and that he had a reputation as a gunman and that I knew he carried guns with him and that I wanted Hurley along to prevent Miller from using his guns on Stevens." He told Hurley and Miller to stay there while he went to the Dreis drug store. A Hudson

touring car came up at this time carrying Roisner and Bernstein. Ben continued toward the drug store and did not meet anyone whom he knew. When he reached there Stevens was leaning against the post in front of the entrance. Ben said: "Hello, Stevens." Stevens pushed a gun against him and said: "I heard two Jews were looking for me." Ben said: "I don't know anything about that," and further, "I am not looking for you." Then Morrie Miller stepped up at his left, swore at Stevens, said: "You won't hijack my stuff any more," and the shooting commenced. Morrie Miller had two guns and shot with both. Ben had no gun and did no shooting. After the shooting they ran west on Ninth street and got into the Hudson car. Hurley was driving. Morrie Miller soon took his place. Hurley was let out of the car later, and finally Ben got out, and took a bus for Minneapolis. He telephoned the syndicate office in Minneapolis, but no one was there. He then called up Ginsberg's office and was informed that Morrie Miller was there. He went to the office and soon afterwards Ginsberg came in, and a number of other members of the syndicate. Ben took supper at Ginsberg's home that evening, and was in hiding until the 18th, when he surrendered.

Abe says that he had worked for the syndicate at $75 a week, or $12.50 a day. He knew that the syndicate shipped large amounts of liquor to St. Paul and Minneapolis in carload lots. He knew Morrie Miller and Tommie Webber and saw them occasionally. About December 7, 1924, he stopped working for the syndicate and went into business on his own account, operating from his father's home on the west side. Between that date and February 16, 1925, he bought more than $20,000 worth of alcohol from the syndicate. On the morning of February 16 he went down town in his auto in response to a call from Ben. Ben and Hurley took the auto, leaving him to watch the liquor, drove away, but soon returned. Ben told him that they had been spotted by some hijackers and that it was necessary to find a place to plant the liquor. They then drove into the country, looking for a place, going about Como, stopped at the Dreis drug store as they came back, and from there drove to the Eighth street garage, where they parted, he going to his home on

the west side. Later in the day he went to Minneapolis. There he met Hurley who told him the story of the shooting as told by him in the testimony hereafter mentioned. Abe was kept in hiding until Wednesday evening when he went home and surrendered to the police.

Hurley was the John Doe defendant indicted with the Gleemans. He was not apprehended until after the Gleeman trial, and upon trial was acquitted. In his testimony he stated that he went with Ben to Minneapolis on the morning of February 16 and brought the alcohol to the Eighth street garage. He was with Ben when they met Stevens and LaSalle on Seventh street near Jackson. In general his testimony is corroborative of that of Ben about their going to the Central garage on Exchange street. He saw Ben when he left for the drug store. About this time the Hudson car came up. Louis Roisner and Harry Bernstein were in it. These two were patrons of the syndicate though not members of it. They were related to one or more of the members. He was directed by them to go up on Ninth street and get some alcohol. He was to take the Hudson car. He got in the car. Morrie Miller disappeared in the direction that Ben had gone. Louis Roisner drove the car south on St. Peter and turned to the right into Ninth towards the west opposite the drug store, and stopped. They saw Morrie Miller standing on the corner. Roisner and Bernstein got out and directed Hurley to go up on Ninth and get the alcohol and stated they would go back with Ben. He started west on Ninth and into Franklin. After the shooting Ben and Morrie ran to his car, got into it, then continued west on Sixth street to Summit, and down Summit to St. Peter where he got out.

Ben and Abe now say that they testified falsely at the trial at the behest of Ginsberg who was fearful that the members of the syndicate would be involved in a charge of murder if the truth were known. A difficulty which they meet is that they must assert that the testimony which they gave at the former trial was perjured. See State v. Henrionnet, 142 Minn. 1, 170 N. W. 699. It must be conceded that the defendants offer to produce testimony which cor-

roborates their own and indicates a connection between Ginsberg and Morrie Miller and other members of the syndicate. The real question is who committed the murder. What Ben and Abe did before and after is not a controlling factor. Not much of the evidence is new to Ben. He knew what occurred at the drug store corner at the two trials and chose to testify falsely. What he now says happened is not new to him. It was known all the time. Abe was told by Hurley what occurred, so far as Hurley knew it, on the evening of the murder. The evidence is that Ben did not tell him the actual facts of the killing until they were in the state prison. Abe, like Ben, chose to testify falsely to help establish a different theory.

It is a strikingly possible story which the Gleemans ask the privilege of placing before another jury. The proposed direct testimony, however, that will put Morrie Miller at or about the place of the murder is only that of Ben and Hurley, though there is other testimony indicating that he was not a myth. No others saw him there. Other testimony, cumulative in character, of those about at the time of the shooting will tend to support Abe's claim that he, Abe, was not there; and still other testimony, cumulative in character, will strengthen his claim that he was on the west side. Ben cannot hope very much that a jury will give him liberty on his new story. If it had been told at the first trial it is not likely that there would have been a second jury. It may be that it is true. It may be that Morrie Miller did the actual killing and that Ben avoided it. We appreciate that Abe's case differs from that of Ben. Throughout the trial it was assumed that the two men who ran to the Hudson car were the murderers. At the trial Ben ascribed the murder to two unknown men suddenly appearing and disappearing. He now says that Morrie Miller did the killing and that he and Miller fled in the Hudson car. This eliminates Abe, and so did Ben's story at the trial. But this is not all the evidence. There is still the evidence positively identifying Ben and Abe as the two who did the shooting. Besides, if there is a new trial the state proposes to offer changed testimony. Kaufman, who testified on behalf of the Gleemans on the two trials, and Gadbois who testified for them at the

first, will, unless they again change their minds, identify them as those who did the shooting. They say in their affidavits that the Gleemans did the killing, and that they, Kaufman and Gadbois, swore falsely at the trials. Whether a new trial for newly discovered evidence should be granted is largely discretionary with the trial court. Dun. Dig. and Supp. §§ 7123-7131. The exercise of the trial court's discretion cannot be disturbed.

3. The defendants claim that their counsel betrayed them to protect the members of the syndicate. They refer to Ginsberg. Counsel appearing for them on this appeal did not appear at the trial. It is not claimed that counsel at the trial other than Ginsberg were unfaithful. Apart from the motion for a new trial upon the ground of newly discovered evidence there is not much of substance in this claim; but counsel urge it, and we consider it briefly.

We are not disposed to deny that the conduct of one's own counsel may be so fraudulent or treacherous that a new trial should be granted because of it. A defendant is entitled to a fair trial. When his counsel has been so incompetent or ignorant as to prevent his getting it, though without fraud or treachery, a new trial may be had in an exceptional case. See People v. Schulman, 299 Ill. 125, 132 N. E. 530, 24 A. L. R. 1022; Cornwell v. State, 106 Ohio St. 626, 140 N. E. 363; Hudson v. State, 76 Ga. 727; State v. Jones, 12 Mo. App. 93; State v. Lewis, 9 Mo. App. 321. Fraud or betrayal gives equal or greater cause. If the story Ben tells of the existence of the syndicate, the connection of Morrie Miller with it as a gunman, his eagerness to kill Stevens in the interest of the syndicate, the arrangement that he should go with Ben to the meeting with Stevens at the drug store, and the subsequent killing of Stevens by Morrie Miller, be true, Ginsberg when told of it might fear that members of the syndicate would be implicated in a charge of murder, and at least that a disclosure of the facts would be productive of great harm to the continuance of the syndicate's activities. It would be better for the syndicate and its members that the facts should not be disclosed. They were not disclosed. The defendants now say that to avoid a disclosure they committed perjury under the guidance of Ginsberg. Whether a new trial should be granted upon the ground claimed

involved the determination of preliminary facts which were for the trial court. It might not have believed the facts claimed or felt that they had not the force attached to them. There is no ground for interfering with the denial of the motion. As we have said before, the new theory, if accepted by the jury, likely would not help Ben; it might help Abe. We decline to overlook the real question which is what occurred at the immediate time of the killing; and however much Ben and Abe testified falsely as to occurrences before and after the killing, their false statements, though important in their bearing, are not controlling factors.

We have examined the claim of misconduct of counsel and find no comment necessary. The prosecution was vigorous. The record would look better now if some things had been omitted by both the state and the defendants; but as trials go there is nothing calling for discussion.

We have examined the numerous assignments of error challenging rulings on evidence. We find nothing that should result in a reversal nor are the assignments of such merit as to require discussion.

There was no exception to the charge at the trial. Two assignments of error are now made, but under a misapprehension of the record. The charge covered the issues thoroughly, protected every right of the defendants, and was without a suggestion of prejudice. The defendants had a fair trial.

Orders affirmed.