# STATE v. ROBERT BILLINGTON.[1]

March 19, 1954.

No. 36,119.

---

[1]Reported in 63 N. W. (2d) 387.

*Hoffmann, Donahue & Graff* and *Joseph A. Rheinberger,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Lowell J. Grady,* Assistant Attorney General, and *George E. Sausen,* County Attorney, for respondent.

DELL, CHIEF JUSTICE.

Defendant was convicted of the crime of murder in the second degree. After an order denying his motion for a new trial, he appealed from the judgment.

On May 7, 1952, defendant shot William Hoffman with a 22-caliber rifle. The bullet entered the forehead and penetrated the brain. Hoffman died the following day. Defendant was indicted for the crime of murder in the second degree, and the trial resulted in his conviction.

Defendant claims that the evidence is insufficient to support the verdict and sustain the conviction. Defendant, a single man, 41 years of age, lived on a farm in Rock Creek township, in Pine county. His neighbor, L. Thiry, owned two farms, one of which was called the "Prall Farm." This farm was located 300 or 400 feet from the defendant's farm. L. Thiry was the father of Harold Thiry and the father-in-law of Hoffman. Hoffman, at the time he met his death, was visiting at the Thiry farm.

On May 5, 1952, defendant shot and killed a dog owned by Harold Thiry. He claimed that the dog was chasing his cattle. Previously he had shot another dog owned by Thiry under somewhat similar circumstances. On the following day Thiry and Hoffman discussed the shooting of the dog with the defendant at the defendant's farm. There is a dispute as to what occurred at that time. Thiry claimed that he requested the defendant to consult an attorney for advice

as to whether he was justified in killing the dog. Defendant claimed that Hoffman threatened to "beat the life out of" him unless he paid for the dog. This was denied by Thiry.

The following afternoon Thiry and Hoffman again returned to the defendant's farm where there was further discussion concerning the dog. Thiry claimed that the defendant agreed to bury the dog, to see the county attorney and pay for it if he were in the wrong, and not to shoot another of Thiry's dogs unless Thiry was first warned. Defendant claimed that Hoffman threatened him with bodily harm unless he buried the dog and paid Thiry $60 for it; also that Hoffman stated he would return after the burial and collect the money. This Thiry also denied. They went to the Prall farm where defendant dug a hole at a place selected by Hoffman and the dog was buried. The defendant then returned to his farm. When about half way home, he noticed Hoffman following him down the road. Defendant entered the house, procured his jacket and rifle, put a box of bullets in his pocket, and walked out onto the steps. He set the rifle down against the house and put on his jacket. Hoffman entered the defendant's driveway and walked toward the house. Defendant's farm was posted with "no trespassing" signs. After Hoffman had passed one of these signs, defendant fired the fatal shot. At that time Hoffman was 60 feet from the defendant, was standing still and unarmed. Hoffman died the following day without regaining consciousness.

Defendant claimed that he fired in self-defense. This issue was submitted to the jury. Upon the trial defendant, while testifying in his own defense, admitted that after his arrest the county attorney inquired of him as to whether Hoffman had threatened him at the time he shot Hoffman and that he had told the county attorney that Hoffman did not. He further admitted that at the same time he was asked by the county attorney whether he thought Hoffman was going to do any harm to him at the time of the shooting and that he answered "no." He testified on the trial that he did not see a gun on Hoffman at the time of the shooting or anything that resembled one; also that he never made any claim to the authorities until about a week before the trial that he thought that Hoffman was

going to shoot him. Likewise, he admitted that he had made no claim of self-defense to the authorities until about a week before the trial.

The sheriff of Pine county testified that after the arrest he inquired of the defendant whether he was in fear of Hoffman at the time of the shooting and that the defendant answered "no." He further testified that defendant said that Hoffman was standing still when he was shot and that defendant had told Hoffman to get back on the road because he had "no trespassing" signs on the farm, that Hoffman refused to leave, and that he then raised his rifle and shot him; that defendant also said that he had another shell in his hand ready to reload the gun in case he missed.

In describing the shooting at the trial defendant stated that he put the gun to his shoulder, drew down on Hoffman's forehead, and squeezed the trigger; that the shot entered Hoffman's forehead where he had aimed. He admitted upon the trial that he had another shell in his hand ready to reload in case he missed on the first shot. On July 13 he wrote a letter to the attorney general while he was in the Washington county jail. In that letter he stated that he had informed the sheriff that he did not want a trial and was ready to go to prison. Nowhere in the letter is self-defense mentioned nor was any claim there made that the shooting was justified. In a statement given to the sheriff and county attorney which defendant signed on May 7 he stated that when he shot Hoffman he knew that he was doing wrong. On the trial he admitted that he made the statement to the sheriff and county attorney. No mention of self-defense or threats by Hoffman appear in the statement and he admits that no such claim was then made to the authorities. At the trial he was asked when he first conceived the idea of self-defense and he answered that he got to thinking afterward about it when he was in the Washington county jail. Allen Thiry and Harold Thiry, who saw the shooting from a distance, testified that Hoffman was standing still with his right hand on his hip when the defendant raised his gun and fired.

In defense of his actions defendant said at the trial that while walking home from the Prall farm he decided to go to the barn

and feed his cows and that, because of the threats which Hoffman had previously made, he planned to get his rifle and take it with him. He then procured the rifle and stood on the steps. He said that, when Hoffman was about two steps past the "no trespassing" sign, he told Hoffman to back off or he would shoot. He said that Hoffman replied that he had been shot at before and to go ahead and shoot and that he would shoot too. He said that Hoffman moved his right hand toward his hip, that he thought Hoffman was going to draw a gun and became fearful of his life. He claimed that he then shot in self-defense.

We need analyze the testimony no further. It appears clear to us from the evidence as a whole that the jury was justified in finding, by the degree of proof necessary in criminal cases, that defendant shot Hoffman because he was trespassing upon defendant's property and refused to leave when ordered to do so; that the killing of Hoffman was inexcusable and unjustifiable within the meaning of M. S. A. 619.08; and that defendant's claim of self-defense was an afterthought which the jury was justified in rejecting.

■ Defendant claims that he was denied a fair trial because of the prejudicial conduct of the county attorney in the presentation of the state's case. He also claims that his counsel failed to protect him from prejudicial error and incompetently conducted his defense; also that the court failed in its duty to afford him a fair trial.

While the sheriff was testifying as a witness for the state, the following occurred:

"Q. [By county attorney] State whether or not you received a call from me stating there had been a murder.

"A. Yes. I got a call from Mr. Sausen [county attorney] and he said there had been a murder out to the Billington place and to come right in."

It is defendant's contention that the county attorney, by his question, implanted the word "murder" in the minds of the jury in the early stages of the trial and that whether he spoke inadvertently or by design is immaterial since it necessarily resulted in prejudice to the defendant.

On the day that Hoffman was shot, a statement signed by the defendant purportedly describing defendant's version of the shooting was given to the sheriff. The statement was received in evidence. On one occasion during the trial the county attorney, in objecting to a question, referred to the statement as a "confession." Defendant claims that the county attorney, in so doing, prejudiced his defense.

At the outset of the trial defendant's counsel admitted in open court that the defendant shot Hoffman as a result of which he died the following day but denied that defendant's shooting was criminal. During the trial the rifle with which Hoffman was shot was received in evidence as was the bullet. The rifle was received over the objection of the defendant as being immaterial, but the bullet was received without objection. Defendant now claims that it was prejudicial error to receive the rifle and bullet in evidence.

After the trial defendant changed attorneys. His counsel now claim that the attorney who represented him upon the trial should have objected to the question asked of the sheriff and the answer given by him using the word "murder" and should have requested the court to admonish the jury to disregard the question and answer or have moved for a mistrial. It is also claimed that defendant's counsel should have prevented the introduction of the gun and bullet in evidence in view of defendant's admission that he shot Hoffman or at least should have properly protected the record on that point for review here. It is also claimed that defendant's counsel inadequately protected the record at the time that the county attorney referred to the statement as a "confession."

It is difficult to understand how any of these occurrences could in any way have prejudiced defendant's case in view of the other evidence introduced at the trial. In the trial of any action, civil or criminal, much must be left to the sound judgment of counsel for the respective parties. Frequently, good judgment justifies counsel in permitting the introduction of evidence which under strict rules could have been excluded. The attorney who tried the case for the defendant is a man of recognized ability. A search of the record

fails to disclose any incompetence in his handling of the defense. Moreover he was selected by the defendant himself. The law is well settled that—

"* * * Where the defense is conducted by counsel selected by defendant or by those to whom he intrusted that duty, it is only under very exceptional circumstances that a new trial will be granted on account of the manner in which the defense was conducted or on account of a subsequently asserted dereliction of duty on the part of such counsel, and where it appears that in consequence of such dereliction of duty the defendant may have been unjustly convicted."[2]

The claim that the court failed to afford the defendant a fair trial by proceeding on its own initiative in respect to the foregoing occurrences is without merit and requires no discussion.

■ While defendant was awaiting trial in jail, he wrote a letter to the attorney general.[3] The state offered it in evidence. Inquiry

---

[2] State v. Lindstrom, 180 Minn. 435, 438, 231 N. W. 12, 13; see, also, State v. Holden, 42 Minn. 350, 44 N. W. 123; State v. Gleeman, 170 Minn. 197, 212 N. W. 203; State v. Gorman, 219 Minn. 162, 17 N. W. (2d) 42; Annotation, 24 A. L. R. 1025.

[3]                                               "Stillwater, Minn
                                                      July 13, 1952
"Sir,
  "The county attorney from Pine county has charged me with first degree murder.
  "I turned myself in after shooting this fellow and told the county attorney and the sheriff I was willing to go to Stillwater Prison and did not care about a trial.
  "My parents got a lawyer and I end up here in the Washington county jail at Stillwater awaiting trial or so I am told.
  "This lawyer was to see me yesterday and I believe I will end up in a mental institution if the lawyer and my parents have their way.
  "I do not care about a lawyer and I do not want to go to a mental institution. I would rather go to a prison or so I think.
  "I wish you would send me to Stillwater prison or any prison before I am sent to a mental institution.
  "Thank you.
                                               "Robert Billington"

was made as to the purpose of the offer, and the county attorney stated that it was offered as an admission of guilt. The court stated that it was not an admission of guilt but was an admission of the shooting. Defendant then objected to its introduction in evidence since the shooting was admitted. The court, however, received it as an admission of the shooting. The letter carried implications greater than the purpose for which it was received and could well have been received generally. Notwithstanding that facts have been admitted by an accused, the prosecution is entitled to introduce evidence to establish such facts providing, of course, the evidence offered is otherwise admissible and not unduly prejudicial to the accused.[4] We conclude that the letter was properly received in evidence.

■ Defendant claims that the court erred in its instructions upon substantive propositions of law. One of the portions of the charge complained of was with respect to the crime of manslaughter in the first degree,[5] which crime was submitted to the jury. The statement "That is admitted" is cited as prejudicial error. The other portion of the charge complained of dealt with the establishment of the homicide.[6] Here the language complained of is the reference to homicide as a crime. It is contended that justifiable homicide is not a crime and that the language used would have the effect of misleading the jury.

[4] 20 Am. Jur., Evidence, § 552; see, Annotation, 91 A. L. R. 1478; 1 Wharton, Criminal Evidence (11 ed.) § 231; State v. Jones, 89 Iowa 182, 56 N. W. 427; People v. Neaton, 294 Mich. 134, 292 N. W. 589.

[5] "* * * In connection with this offense, as you have been before instructed with regard to murder in the second degree, in order to convict the defendant it is necessary for the state to establish beyond a reasonable doubt two elements of facts; that is the death of Hoffman and that he was shot by someone without excuse or justification. *That is admitted.* And also shot by defendant without a design to effect the death in the heat of passion by means of a dangerous weapon." (Italics supplied.)

[6] "* * * You may therefore consider, as, I believe, have stated, that the fact that *the crime* of homicide has been established and that there is no need to consider the evidence on that fact issue during your deliberation." (Italics supplied.)

It is well settled that in construing a charge it must be reviewed in its entirety and read as a whole.[7] The crime charged in the indictment was explained and proper instructions on the presumption of innocence and guilt beyond a reasonable doubt were given to the jury. The indictment was read, and homicide was accurately defined as the killing of a human being by the act of another and as being either murder, manslaughter, excusable homicide, or justifiable homicide. The jury was clearly instructed that the defendant denied any criminal liability for the shooting and that in order to convict him of the crime charged the state had the burden of proving, beyond a reasonable doubt, in addition to the death, that defendant killed Hoffman without excuse or justification. The crimes of murder in the second degree and manslaughter in the first degree were both defined and submitted to the jury. Then followed a treatment of the law regarding provocation and after instructions concerning the statement signed by the defendant the court gave this specific instruction:

"* * * However, the defendant denies that he is criminally liable for said shooting on the ground that he shot the deceased in self defense. In other words, the defendant asserts the defense that the homicide was justifiable."

A full explanation of the applicable law of self-defense followed. Again the jury was impressed with the necessity of the state proving that a crime was committed and that the shooting was not justifiable on the ground of self-defense. It was instructed that the fact that Hoffman had no right to remain on defendant's premises without his consent did not, in itself, constitute justification for the killing of Hoffman. Then followed an instruction that the burden of proof did not rest upon the defendant to show that he was justified in what he did but that the burden rested upon the state to

---

[7]Blumenthal v. United States (8 Cir.) 88 F. (2d) 522; State v. Rasmussen, 241 Minn. 310, 63 N. W. (2d) 1; State v. Waltz, 237 Minn. 409, 54 N. W. (2d) 791; State v. Murphy, 181 Minn. 303, 232 N. W. 335, 71 A. L. R. 66.

establish beyond a reasonable doubt that the crime was committed and that the killing was not justifiable on the ground of self-defense.

The two statements complained of are contained in a comprehensive charge not otherwise subject to criticism. It is evident that, although the statements were not correct, they were inadvertently made. Considering the charge as a whole it appears clear to us that the jury was not misled by these inadvertent statements and that no prejudice resulted to the defendant. Moreover, at the close of the charge the court inquired of counsel as to whether anything had been omitted or inadvertently stated. No objection was made to the charge nor were the inadvertent statements called to the attention of the court. The rule is well settled that when a charge as a whole is substantially correct but in some particulars is verbally inaccurate or contains obviously unintentional misstatements, which it is fair to assume the court would have corrected had the matter been called to its attention, it is the duty of counsel to bring the matter to the attention of the court in a timely and proper manner, and if he fails to do so he waives the right to later on object either on a motion for a new trial or on appeal.[8] Furthermore the constitutional guarantee of a fair trial does not insure the accused of a trial which is perfect in every detail. The granting of a new trial in criminal cases is done cautiously, and a conviction will not be reversed for mere technical errors where it appears that the accused has not been prejudiced through the impairment of substantial rights essential to a fair trial.[9]

State v. Wilson, 238 Minn. 447, 57 N. W. (2d) 412, is distinguishable from the case here. There, this court pointed out that the instruction complained of was neither an unintentional misstatement, a verbal error, or an omission. We characterized it as a posi-

[8]Steinbauer v. Stone, 85 Minn. 274, 88 N. W. 754; see, State v. Lytle, 214 Minn. 171, 7 N. W. (2d) 305; State v. Solum, 183 Minn. 36, 235 N. W. 390; State v. Hagen, 160 Minn. 408, 200 N. W. 480; State v. O'Connor, 154 Minn. 45, 191 N. W. 50; 6 Dunnell, Dig. & Supp. § 9798.

[9]State v. DeZeler, 230 Minn. 39, 41 N. W. (2d) 313, 15 A. L. R. (2d) 1137; State v. Dimler, 206 Minn. 81, 287 N. W. 785; State v. Barnett, 193 Minn. 336, 258 N. W. 508; 5 Dunnell, Dig. (3 ed.) § 2490.

tive instruction that the jury should base its decision on the determination of which of two witnesses they believed and said that this was not an error at all in the sense that the court misspoke itself. We held that it was an error on a controlling principle and hence such an error as could be assigned on a motion for a new trial. In the case now before us we conclude that the court simply misspoke itself and that the errors were obviously unintentional misstatements which it is fair to assume the court would have corrected had the matter been called to its attention. Moreover, both before and after the statements complained of here, the court correctly stated the law to the jury.

Affirmed.