**STATE of Minnesota, Respondent,**

v.

**Michael J. DIMMICK, Appellant.**

**No. C3–97–1698.**

Supreme Court of Minnesota.

Oct. 22, 1998.

---

**5.** *State v. Smith,* 541 N.W.2d 584, 589 (Minn. 1996).

**6.** *Id.*

John M. Stuart, Minn. Public Defender, Susan J. Andrews, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Raymond F. Schmitz, Olmsted County Atty., James S. Martinson, Sr. Asst. County Atty., Rochester, for respondent.

## OPINION

PAGE, Justice.

An Olmsted County jury convicted Michael J. Dimmick of one count of premeditated first-degree murder and one count of first-degree felony murder for the killing of Mary Ann Tigner. In this appeal, Dimmick seeks a new trial based on his claim that the trial court committed reversible error when it refused to instruct the jury on the lesser-included offense of second-degree felony murder. Because we conclude the trial court did not abuse its discretion when it refused to instruct the jury on second-degree felony murder, we affirm Dimmick's conviction.

Dimmick worked as a cook at Shenanigans, a bar and restaurant owned by Tigner in Rochester, Minnesota. On Sunday, April 21, 1996, Tigner arrived at Shenanigans about an hour before its scheduled opening of 5:00 p.m., so she could complete the week's bookkeeping. Her office was in the basement of the building and, because the office was usually stuffy, she generally left the door open. At about 4:30 p.m., John Olson, the bartender, arrived at Shenanigans. When Olson arrived, he found Dimmick waiting at one of the back doors. Tigner let Olson and Dimmick in and the two men began preparations for opening. Tigner returned to her office where she made three phone calls—one to her daughter-in-law at 4:40 p.m., one to a supplier at 4:50 p.m., and one to one of her waitresses around 4:50 p.m.

At about 5:00 p.m., Brandon Ball, another cook at Shenanigans, arrived and went downstairs to the time clock to punch in. To get to the time clock, he had to pass Tigner's office and, in doing so, noticed the door was closed. After punching in, Ball went upstairs to the kitchen. While Ball was standing at the prep table, Dimmick came up behind him and told him that he was ill. Ball testified that Dimmick looked pale and his voice was shaky. Ball told Dimmick to go home and rest, but to be sure to return by 7:00 p.m. because Ball had to go to another job. Before leaving, Dimmick told Ball that he would pick up his jacket later. Shortly thereafter, as Ball was throwing away some trash in the dumpster behind Shenanigans, he saw Dimmick stoop down, pick up his jacket, and walk away. Suspecting that Dimmick was walking off the job, Ball went to the time clock and punched Dimmick out at 5:18 p.m.

At around 5:00 p.m., Tigner's daughter-in-law tried to contact Tigner by phone about dinner plans. Olson answered the call and buzzed Tigner to indicate that she had a phone call, but there was no response. Around 5:30 p.m., Olson noticed the bar phone was out of order. Tigner's daughter-

in-law and son each tried to call Tigner a number of times, on both her business and personal phone lines, between 5:25 and 6:00 p.m., but the lines were always busy. At approximately 6:45 p.m., they drove to Shenanigans, and Tigner's son went down to the office where he found the door closed and locked. Looking under the door, he saw his mother's foot and leg and proceeded to kick in the door. Once inside, he found his mother's bloody body lying on the floor.

When the police arrived, they found Tigner lying on her back in a pool of blood with her head near an open safe. The police determined that almost $11,000 in cash was missing from the office, and the office phones had been disconnected. An autopsy determined that Tigner had been cut and stabbed more than 35 times, with wounds to her neck, back, chest, and sides, including wounds to her jugular vein and her spinal column, as well as defensive wounds on both of her hands. In addition, she had two large contusions on her head and a broken nose. As a result of her injuries, Tigner bled to death, although no single injury by itself caused her death. According to the coroner, the assault on Tigner most likely occurred between 4:45 and 5:15 p.m. and took only 1 to 2 minutes. The coroner estimated that it would have taken no more than 15 minutes for Tigner to have bled to death. A blood splatter analysis done at the scene told investigators that the struggle leading to Tigner's death was confined to a small area of the room and that most of the wounds were inflicted while she was very close to the floor.

The police investigation determined that, upon leaving Shenanigans, Dimmick returned to his apartment. At 5:30 p.m., two of his neighbors saw him leaving his apartment with a duffel bag and a white plastic bag. One of the neighbors noted Dimmick's presence because Dimmick had told him that he had to work at 4:00 p.m. that day. When the neighbor asked Dimmick what he was doing, Dimmick replied that he had to get back to work. However, Dimmick did not return to work and, instead, appears to have checked into the Langdon Motel under an assumed name and then used a limousine service to take him to the Minneapolis–St. Paul International Airport. The next morning, Dimmick went to First Bank in St. Paul, withdrew $6,155.64 in cash, and closed his account.

Dimmick was subsequently arrested in Brighton, New York. At the time of his arrest, Dimmick had over $700 in cash on his person. A search of an apartment he rented in Rochester, New York, resulted in the discovery of over $16,000 in cash. Blood found on some of the money matched Tigner's DNA type. An earlier search of Dimmick's Minnesota apartment found a pair of shoes with splatters of blood and a blue jean jacket with blood inside the left sleeve. That blood also matched DNA from Tigner's blood.

■■■■ The trial court instructed the jury on first-degree murder, which requires premeditation and intent, and first-degree felony murder, which requires intent to kill during the commission of a felony,[1] but declined to give an instruction on second-degree felony murder as requested by Dimmick. Dimmick argues the trial court erred in refusing to instruct the jury on the elements of second-degree felony murder as a lesser-included offense of first-degree murder. Second-degree felony murder does not require a showing of intent.[2]

We have held that:

The determination of what, if any, lesser offense to submit to the jury lies within the sound discretion of the trial court, but where the evidence warrants an instruction, the trial court must give it. An instruction on a lesser charge should be submitted when: (1) the offense in question is an "included" offense; and (2) a rational basis exists for the jury to convict appellant of the lesser offense and acquit him of the greater crime.[3]

In *State v. Koop*, we said "the lesser-included offense charge is not required simply because the jury could exercise its power of

---

**1.** *See* Minn.Stat. § 609.185, subds. 1 and 3 (1996).

**2.** *See* Minn.Stat. § 609.19, subd. 2(1) (1996).

**3.** *State v. Buntrock,* 560 N.W.2d 383, 386 (Minn. 1997) (citations and internal quotations omitted).

acquitting on the greater charge for no reason at all 'in the teeth of both law and facts' * * *."[4] Upon a determination that the trial court erred in failing to submit a lesser-included offense to the jury, this court should reverse the conviction only if the defendant is prejudiced by the error.[5] Second-degree felony murder is a lesser-included offense of first-degree murder.[6] Therefore, the sole issue before us in this case is whether the evidence would reasonably support an acquittal on the two first-degree murder offenses and a conviction on the offense of second-degree felony murder.

The underlying premise of Dimmick's argument is that the jury could have rationally concluded that in carrying out the attack on Tigner he only intended to disable her and not kill her, and that he unplugged the phones and locked the door to buy time to facilitate his escape. In support of this premise, he points to the fact that no single wound by itself was fatal and, by implication, suggests that he did nothing to ensure that Tigner would die.

In essence, Dimmick is asking this court to conclude that because no single injury to Tigner was fatal, there was a rational basis for the jury to conclude that he did not intend to kill her. The premise underlying Dimmick's argument is flawed. On the facts presented by this case, we can find no rational basis for the jury to have concluded that Dimmick did not intend to kill Tigner. On the one hand, Dimmick's intent to kill Tigner can be inferred from the robbery and attack on Tigner, the viciousness of the attack, the number of wounds inflicted, and Dimmick's conduct after the attack. Tigner was cut and stabbed over 35 times while she was nearly prone on the floor, her jugular vein was cut, her spinal column was penetrated, her nose

was broken, and she received two large contusions to her head. Once the attack on Tigner was over, Dimmick disconnected two phones, took the money, locked the door behind him as he left, and took no action to get help for her.[7]

On the other hand, there is no evidence in the record supporting the theory that Dimmick did not intend to kill Tigner. Dimmick's theory, that the jury could have concluded he only intended to incapacitate Tigner in order to escape, has no merit.[8] The viciousness of the attack on Tigner went well beyond anything necessary to merely incapacitate her. Given the overwhelming evidence in the record from which it can be inferred that Dimmick intended to kill Tigner and the lack of evidence from which it can be inferred that he did not intend to kill her, we conclude there is no rational basis for a jury to acquit Dimmick of the first-degree murder offenses and to convict him of the lesser-included offense of second-degree felony murder. Therefore, we affirm Dimmick's conviction.

Affirmed.

LANCASTER, J., took no part in the consideration or decision of this case.

---

4. 380 N.W.2d 493, 494 (Minn.1986) (citation omitted).

5. *Bellcourt v. State,* 390 N.W.2d 269, 273 (Minn. 1986).

6. Minn.Stat. § 609.04, subd. 1(1) (1996) (a lesser-included offense is "a lesser degree of the same crime"); *State v. Leinweber,* 303 Minn. 414, 422, 228 N.W.2d 120, 125–26 (1975).

7. *See State v. Raymond,* 440 N.W.2d 425, 426 (Minn.1989) (holding that intent to cause death could be inferred "from the nature and extent of the wounds and the fact that the defendant left [decedent] to bleed to death while he went home to bed.").

8. *See State v. Cooper,* 561 N.W.2d 175, 179 (Minn.1997) (court found defendant's argument that his intent was solely to incapacitate the victim when he shot him below the waist no less than twelve times with a semi-automatic weapon was without merit).