**STATE of Minnesota, Respondent,**

v.

**Andy William PRTINE, Appellant.**

**No. A09–702.**

Supreme Court of Minnesota.

June 30, 2010.

Lori Swanson, Attorney General, Peter R. Marker, Assistant Attorney General, St. Paul, MN; and Melanie S. Ford, St. Louis County Attorney, Duluth, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Steven P. Russett, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

PAGE, Justice.

On September 12, 2008, appellant Andy William Prtine was indicted for first-degree premeditated murder and first-degree felony murder for the death of Brent Ward. On January 21, 2009, a St. Louis County jury acquitted Prtine of first-degree premeditated murder, but found him guilty of first-degree felony murder. The district court sentenced Prtine to the mandatory term of life in prison. In this direct appeal, Prtine raises the following issues: (1) whether the district court erred when it refused to strike, for cause, a juror who stated that she was more inclined to credit the testimony of police witnesses over that of other witnesses; (2) whether the district court erred when it allowed the medical examiner to offer his opinion that the victim's assailant acted with an intent

to kill; (3) whether the prosecutor committed misconduct; (4) whether the district court committed plain error when it told the jury there was no need to consider lesser-included offenses if the jury found Prtine guilty of a greater offense; and (5) whether Prtine was denied his right to effective assistance of counsel when his trial counsel conceded during closing argument that the State had proven the element of intent. We remand to the district court to determine whether Prtine acquiesced in his trial counsel's decision to concede intent.

In November 2006, Brent Ward moved to Hibbing, Minnesota, to take a job as a painter with his cousin, Mike Partyka. Ward rented an apartment above the Sportsmen's Bar and Restaurant. While living in Hibbing, Ward sold drugs and sometimes "shorted" his customers.[1] Prtine was a customer of Ward's.

On November 8, 2007, Prtine went to Ward's apartment between 5 and 6 p.m. and purchased crack cocaine. The following day, Ward did not show up for work. That night, Partyka was drinking at the bar below Ward's apartment when he received a phone call telling him he should check on Ward because there was blood on Ward's door handle. Partyka went upstairs to Ward's unlocked apartment, found Ward face down on the kitchen floor, and called the police.

When the police arrived, they observed a blood trail leading from Ward's apartment down a stairwell and onto the exit door. Ward appeared to have been stabbed. The police concluded that there had been a struggle based upon blood splatter on Ward's bed, kitchen counters and sink, refrigerator, and walls. The police found a crow bar underneath Ward, but the knife used to stab Ward was not at the crime scene. Inside Ward's front pant pocket was $230; however, the police learned that Ward had been paid $800 the previous day. Blood was found in three of Ward's pockets. It was subsequently determined that the blood in the pocket with the $230 matched Prtine's DNA, and blood found in two of Ward's other pockets contained DNA mixtures consistent with both Ward and Prtine. Police also learned that Ward's cell phone was missing.

The medical examiner, Dr. Thomas Uncini, conducted an autopsy on Ward's body and found at least 63 knife wounds. The injuries centered around Ward's face, hands, and neck. Ward also had additional knife wounds to his left diaphragm and shoulder and abrasions on his knees. Two stab wounds to Ward's neck and upper chest severed his jugular vein and were fatal. There were also numerous incision wounds on Ward's hands, which Dr. Uncini characterized as defensive injuries. Dr. Uncini determined that Ward bled to death and ruled the death a homicide.

On November 11, a woman contacted the police after finding a cell phone case, knife sheath, and bloody dollar bill in a dumpster behind her garage. When the police arrived, they saw a bloodstain on the lid of the dumpster and noticed that the knife sheath retrieved from the dumpster had the initials "A.P." scratched onto the back of it. In front of the dumpster was another bloody dollar bill and, after searching the area, the police found a bloodstain on a second dumpster. The police searched the second dumpster and found a Green Bay Packers knit hat and a pair of gloves. DNA testing revealed that the blood smears on the dumpsters and dollar bills matched Prtine's DNA. Prtine lived a block away from the dumpsters.

---

1. Evidence at trial established that to "short" a customer means to give the customer a smaller quantity of drugs than the amount the customer believed he or she was purchasing.

Upon questioning by the police, Prtine admitted that he had a hat, gloves, and a knife sheath similar to those found in the dumpsters, but he indicated that the items found in the dumpsters were not his and that his hat and gloves were at home. The police, with Prtine's assistance, searched his house for the hat, gloves, and knife sheath. They did not find the items, but they did observe blood drops on the garage floor and near a basement floor drain. Prtine indicated that he would tell the police all he knew about Ward's murder, but he said that he first needed to go to the hospital. Prtine indicated that he had cuts on one of his arms that came from cutting scrap metal. One of the cuts was a deep cut on his forearm that been superglued together and camouflaged by using a magic marker to draw what appeared to be a tattoo.

On November 13, Prtine told the police that they could recover the missing knife from his basement floor drain. Later that afternoon, with his counsel present, Prtine told police that he bought drugs from Ward between 5 and 6:30 p.m. on November 8 and returned between 9 and 10 p.m. to buy more drugs. According to Prtine, an argument ensued, Ward hit Prtine in the face with his fist, and then Ward grabbed a knife that Prtine had given him during an earlier drug transaction. Prtine claimed he managed to gain possession of the knife and began stabbing Ward. Prtine's trial testimony mirrored his November 13 statement to the police.

At trial, the State introduced evidence that Prtine was having financial difficulty, had been "shorted" by Ward on the night of Ward's death, and had once told a friend that he was going to stab another drug dealer who had "ripped [him] off." The State also sought to discredit Prtine's claim that he had given a knife to Ward in an earlier drug transaction. Several wit-nesses testified that the only knife Ward had was a small pocketknife. In addition, on cross-examination, a defense witness testified that Ward once told him that: "The golden rule of dealing drugs is never take nothing in trade." The defense attempted to counter this evidence with testimony from Partyka that he once saw Ward give a check and wallet back to Prtine after Prtine gave Ward $50. The jury weighed the evidence and found Prtine not guilty of first-degree premeditated murder but guilty of first-degree felony murder.

## I.

We first address Prtine's claim that his conviction should be reversed because of the district court's refusal to strike a juror for cause after the juror indicated that she would be more inclined to believe a police officer's testimony over that of other witnesses. In this case, voir dire involved a process during which both parties and the court questioned prospective jurors with the court removing jurors subject to challenge for cause. From the remaining pool of 39 jurors, the defense was required to exercise 15 peremptory challenges and the State 9, which reduced the juror pool to 12 jurors and 3 alternates.

During preliminary questioning from the district court, juror J.B. indicated that she knew various law enforcement personnel, including one of the lead investigators involved in this case. When initially asked by the court if she would treat "a police officer's testimony as inherently either better or worse or more or less believable than anybody else's," J.B. responded, "I guess to be honest, I would be more inclined to believe them." Upon further questioning by the court, J.B. indicated that she would not automatically credit a police officer over other witnesses but

"would listen to the facts, I think." After examination by the prosecutor, defense counsel asked J.B. if she would be more inclined to believe those witnesses she recognized on the witness list. J.B. replied, "If it was a police officer." Upon further examination, J.B. stated, "I think that's human nature to believe a police officer. You want to believe that police officer." However, J.B. indicated she would "try and be fair" and "would weigh the facts." Finally, when defense counsel asked J.B. if the facts were unclear and she had to make a judgment call between an officer and an unknown person which way would she lean, J.B. responded, "[t]oward the police officer." When defense counsel asked if that was simply by virtue of the witness being a police officer, J.B. replied, "I guess so."

After defense counsel moved to have J.B. removed for cause, the district court noted that it had "covered the same ground in [its] questioning and got a different answer." During further discussions with the court, J.B. indicated that she knew some officers "are not good officers." She also agreed with the district court that "ultimately, whether the person is a police officer or not is one small fact, and after you hear the testimony, [ ] you decide what weight you believe [the testimony] should be given without having a pre-judgment about it" and that "all law enforcement officers are [not] always right." The discussion ended with the court having J.B. acknowledged that "[as] with any profession, there's ... good and bad" police officers. Ultimately, the court declined to strike J.B. for cause and de-

fense counsel exercised a peremptory strike to remove J.B.

### A.

■■■ A juror may be challenged for cause on a number of grounds, including "[t]he existence of a state of mind on the part of the juror ... which satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the party challenging." Minn. R.Crim. P. 26.02, subd. 5(1)1 (2009).[2] When a juror expresses such a state of mind, the district court must either " 'excuse [the juror] for cause, or by instructions and additional questions convince the [juror] that there is no special credence due the testimony of [police] officer[s].' " *State v. Logan*, 535 N.W.2d 320, 325 (Minn.1995) (third alteration in original) (fourth alteration in original) (quoting *United States v. Amerson*, 938 F.2d 116 (8th Cir.1991)). A prospective juror may be rehabilitated if the juror states unequivocally that he or she will follow the district court's instructions and will set aside any preconceived notions and fairly evaluate the evidence. *Id.* at 323. A reviewing court should give deference to the district court's ruling on challenges for cause because the district court is "in the best position to observe and judge the demeanor of the prospective juror." *State v. Graham*, 371 N.W.2d 204, 206 (Minn.1985); *see also Logan*, 535 N.W.2d at 323 (holding that the question of whether a juror is impartial is a credibility determination and that appellate courts defer to a district court's finding of impartiality).

In *State v. Logan*, we found reversible error when the district court denied the

---

2. Effective January 1, 2010, this court adopted a complete stylistic revision to the Rules of Criminal Procedure. Order Promulgating Amendments to the Minnesota Rules of Criminal Procedure, C1–84–2137 (Minn. Oct. 27, 2009). The changes made to Minn. R.Crim. P. 26.02, subd. 5(1)1 (2010), were not substantive. We have cited to the version of Rule 26.02, subdivision 5(1)1, that was in effect when the district court ruled on Prtine's motion to strike juror J.B. for cause.

defendant's motion to strike for cause a juror who stated during voir dire that he was inclined to give greater credence to police-officer testimony than to other testimony. 535 N.W.2d at 324. After the juror indicated that he was inclined to give greater credence to police-officer testimony, the State, using leading questions, got the juror to say that he would "try" to be fair and that he would follow the instructions given by the district court to the best of his abilities. *Id.* However, when given the opportunity to use his own words on cross-examination, the juror stated, " 'I do feel that I'm going to favor in some way, shape or form what [police officers] do because that's how I feel. That's just how I feel. Although, when asked—I would certainly be objective, you know, as best I could.' " *Id.* We held that while the district court has considerable discretion in ruling on challenges for cause, allowing the juror to sit was error because the juror did not " 'swear that he *could* set aside any opinion he might hold and decide the case on the evidence.' " *Id.* (quoting *Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)).

While the district court here, using leading questions, was able to get J.B. to agree that police officers are fallible, J.B. never swore that she "could set aside any opinion [she] might hold and decide the case on the evidence." *See id.* In fact, each time J.B. was given the opportunity to express her sentiments in her own words J.B. said she would be more inclined to believe a police officer's testimony. In that respect, J.B.'s statements during voir dire are akin to those made by the juror in *Logan.* Therefore, we conclude that the district court erred when it declined to strike juror J.B. for cause.

### B.

Having concluded that the district court erred, we must next determine whether the error requires reversal of Prtine's conviction. In an 1881 decision, *State v. Lawlor,* we held that a district court's failure to strike a disqualified juror for cause was not grounds for reversal when the defendant, who had not exhausted all of his peremptory challenges, was required to use a peremptory challenge to strike the disqualified juror. 28 Minn. 216, 217–18, 9 N.W. 698, 698–99 (1881). In doing so, we noted that "[a] very different question would be presented if the defendant had exhausted his peremptory challenges [because the challenge used to strike the disqualified juror may] have been required for another juror who was legally qualified to serve." *Id.* at 217–18, 9 N.W. at 699. We ultimately concluded that "the defendant was tried by a jury qualified in law, and it was of no consequence to him whether [the juror] was excused by order of the court as disqualified, or by his peremptory challenge." *Id.* at 218, 9 N.W. at 699.

More recently in *State v. Barlow,* we held that even if the failure to dismiss a juror for cause was erroneous, any error was cured by the defendant's exercise of a peremptory challenge to remove the juror. 541 N.W.2d 309, 312–13 (Minn.1995). We noted that "[t]he peremptory [challenge] served the purpose for which it is intended and the potential juror did not serve on defendant's jury." *Id.* at 312. We concluded that the necessity to exercise a peremptory challenge to strike a juror whom the district court had erroneously refused to remove for cause does not deprive the defendant of a fair trial. *Id.* at 311 (citing *Ross v. Oklahoma,* 487 U.S. 81, 89, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988)).

Prtine argues that he was denied his full complement of peremptory challenges because the district court erroneously refused to dismiss J.B. for cause. He does

not, however, contend that the district court's error resulted in a biased juror sitting on his jury, nor does he identify a particular juror he would have stricken had he not used the peremptory challenge to strike J.B. In attempting to distinguish *Barlow*, Prtine argues that, although his jury may have been fair, reversal is warranted because he did not receive all of the peremptory challenges he was entitled to under Minnesota law. Prtine argues that his exercise of the peremptory challenge to remove J.B. had the same effect as if the district court only gave him 14 peremptory challenges instead of the 15 he was permitted by law. He further argues that the loss of the peremptory challenge resulted in the seating of a juror who, but for the court's error, would have been stricken, and that the improper seating of the juror, even if the juror was unbiased, was per se prejudicial.

Prtine's claim that reversal is warranted is unconvincing. Here, as in *Barlow*, the peremptory challenge served the purpose for which it was created, to remove a juror, objectionable to Prtine, from the jury pool. The district court's failure to strike juror J.B. for cause may have deprived Prtine of a perfect jury-selection process, but it did not deprive him of a fair jury-selection process. It is well settled that a criminal defendant is not guaranteed a perfect trial or jury selection process, simply a fair one. *See State v. Billington*, 241 Minn. 418, 427, 63 N.W.2d 387, 392–93 (1954). Here, the district court's decision may have affected how Prtine exercised his peremptory strikes, but it did not deny him his full complement of strikes. Therefore, Prtine is not entitled to a new trial based on his claim that he was denied his full complement of peremptory strikes.

## II.

█ Prtine next contends that the district court committed reversible error when it allowed the medical examiner to offer his opinion that Ward's assailant acted with an intent to kill. At trial, Dr. Uncini, the medical examiner, testified that he believed that Ward's assailant had the intent to injure or kill Ward. Specifically, Dr. Uncini testified that the nature, number, and location of the wounds depicted in the photograph "indicates to me an intent to injure or kill." He later added that the wounds indicate "a clear intent to injure this person or kill him." He explained that a long incision on the victim's back was one of the last ones made and would have left the victim in a helpless position. He further testified that the long incision shows "a real desire to kill this person" and was "an attempt to [ ] completely kill him" and "really finish him off."

After an objection by the defense that the medical examiner was speculating, the court ruled that the testimony was "rationally based on the [witness's] observations." The medical examiner then explained that he determined that this was a crime of passion based on the nature and extent of Ward's injuries. He testified that the assailant was "doing their best to kill this person," "purposely trying to kill them," and wanted to show they were in charge by maybe trying to cut off the victim's head.

█ We review evidentiary rulings for an abuse of discretion, and we will not reverse a district court's findings unless the findings are clearly erroneous. *State v. Mahkuk*, 736 N.W.2d 675, 686 (Minn. 2007). The defendant has the burden of proving both that the district court abused its discretion and that prejudice resulted. *State v. Nunn*, 561 N.W.2d 902, 907 (Minn. 1997).

In *State v. Provost*, we held that expert opinion testimony is not admissible on the

ultimate question of whether the defendant had the requisite mens rea when he committed the crime because mens rea is a legal construct and therefore a mixed question of law and fact. 490 N.W.2d 93, 101 (Minn.1992). We noted that "any probative value of [experts opining about whether the defendant had the requisite mental state] is substantially outweighed by the confusion and prejudice engendered by the 'semantic jousting' of the experts." *Id.* We further noted that "[j]urors in their everyday lives constantly make judgments on whether the conduct of others was intentional or accidental, premeditated or not." *Id.* We concluded that a juror and an expert are equally positioned to make determinations of intent and it is the juror's job to make such determinations, "not the expert's as a thirteenth juror." *Id.* at 102.

Similarly, in *State v. Chambers*, we held that a medical expert should not be allowed to make an "expert inference" that the offense was committed with an intent to kill because such determinations are solely within the jury's province. .507 N.W.2d 237, 239 (Minn.1993). However, a medical expert may appropriately testify to things such as "the number and extent of the wounds, the amount of bleeding, whether the wounds were caused by a knife or a blunt instrument ... whether the wounds could or could not have been the result of accident, the cause of death, and so forth." *Id.; see also State v. Bradford*, 618 N.W.2d 782, 793 (Minn.2000) (holding that a medical examiner's opinion that the manner of death was homicide was helpful to the jury's determination of whether a fatal gunshot wound was self-inflicted or inflicted by another).

Here, the State concedes that "Dr. Uncini's testimony as to the assailant's intent was error in light of the rule established in *Chambers.*" However, the State argues that Prtine is not entitled to reversal of his conviction because he has failed to prove prejudice. We agree.

We will not reverse a defendant's conviction based on improper testimony from the medical examiner on the assailant's intent when the testimony does not result in prejudice. *State v. Bauer*, 598 N.W.2d 352, 364 (Minn.1999) (holding that the defendant was not prejudiced by the medical examiner's testimony that the victim's assailant intended to kill her because the jury could infer intent to kill when the victim was covered in bruises and strangled by a telephone cord wrapped tightly around her neck and secured by a metal coat hanger); *Chambers*, 507 N.W.2d at 238 (holding that the defendant was not prejudiced because the jury readily could have found that whoever inflicted the wounds did so with an intent to kill given that the victim was stabbed eight times including a fatal elongated neck incision). In this case, Prtine was not prejudiced by the medical examiner's improper testimony.

Admissible evidence at trial established that Ward suffered 63 stab wounds, largely around the face and neck, including two fatal wounds severing the jugular vein. This evidence of the nature and extent of Ward's injuries was extensive and readily supports the conclusion that Ward's assailant intended to kill. Moreover, the medical examiner's testimony did not negate Prtine's defense at trial. At trial, Prtine claimed that he acted in self-defense, not that the killing was unintentional. Whether one is justified in using deadly force is an objective inquiry into whether a person reasonably believed that the killing was necessary to avert death or great bodily harm, not an evaluation of the defendant's subjective state of mind. *See State v. Johnson*, 719 N.W.2d 619, 631–32 (Minn. 2006); *see also* Minn.Stat. § 609.065 (2008)

(permitting the intentional taking of another's life when necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death). Because there was ample admissible evidence to support the conclusion that Ward's assailant intended to kill and because a criminal defendant's subjective intent to kill does not negate a self-defense claim, we conclude that the medical examiner's improper testimony did not result in prejudice to Prtine.

### III.

Prtine next argues that he is entitled to a new trial because of prosecutorial misconduct. Prtine did not object to any of the alleged misconduct; thus, our review is for plain error. *See State v. Jones,* 753 N.W.2d 677, 686 (Minn.2008); Minn. R.Crim. P. 31.02. In order for us to review for plain error, the appellant must establish that there is: (1) error; (2) that is plain; and (3) that affects substantial rights. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). If each of these requirements is met, we then assess whether we should address the error to ensure fairness and the integrity of the judicial proceedings. *Id.*

"An error is plain if it was clear or obvious," and "[u]sually this is shown if the error contravenes case law, a rule, or a standard of conduct." *State v. Ramey,* 721 N.W.2d 294, 302 (Minn.2006) (citations omitted) (internal quotation marks omitted). If plain error is proven in the context of prosecutorial misconduct, the burden then shifts to the State to show that substantial rights were not affected. *Id.* Unobjected-to error affects substantial rights if there is a reasonable likelihood that the absence of misconduct would have had a significant effect on the jury's verdict. *Id.* If the State fails to demon-

strate that substantial rights were not affected, " 'the appellate court then assesses whether it should address the error to ensure fairness and the integrity of the judicial proceedings.' " *Id.* at 298 (quoting *Griller,* 583 N.W.2d at 740). To determine if the error was prejudicial, we evaluate the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions. *See State v. Dobbins,* 725 N.W.2d 492, 513 (Minn.2006); *State v. Mayhorn,* 720 N.W.2d 776, 790–91 (Minn.2006); *State v. Swanson,* 707 N.W.2d 645, 658 (Minn. 2006); *State v. Buggs,* 581 N.W.2d 329, 341 (Minn.1998).

Prtine's first claim of prosecutorial misconduct is that the prosecutor elicited improper character evidence from defense witness Alexis Mallick. On cross-examination, the prosecutor asked Mallick if Ward was a violent person. Mallick replied no, and the prosecutor then asked Mallick to "[e]xplain to the jury what [Mallick] meant by that." Mallick identified two instances in which Ward exhibited non-violent behavior. She testified that she once saw Ward get punched in the face while at a bar and refuse to fight back. She also testified that on another occasion, Ward was slapped in the face and Ward's only reaction was to turn to his friends and say, "[l]et's get out of here."

Generally, evidence of a person's character or a trait of character is not admissible to prove action in conformity therewith on a particular occasion. Minn. R. Evid. 404(a). However, evidence of the character trait of peacefulness of the victim offered by the State to rebut any evidence that the victim was the first aggressor is admissible. Minn. R. Evid. 404(a)(2). When admissible, proof of a character trait may be shown only by testimony as to

reputation or testimony by way of opinion, except on cross-examination when inquiry into specific instances of conduct is permitted. Minn. R. Evid. 405.

We need not decide whether the prosecutor's questions constituted misconduct because, even if there was misconduct, it did not affect Prtine's substantial rights. The prosecutor's cross-examination of Mallick takes up less than two pages of a trial transcript that exceeds 2,700 pages. Given the brief and isolated nature of Mallick's testimony, coupled with the fact that the State did not repeat or otherwise dwell on it and the other evidence in the record from which Prtine's guilt could be inferred, we conclude there is no reasonable likelihood that the absence of the alleged misconduct would have had a significant impact on the jury's verdict.

 We reach the same conclusion with respect to Prtine's claim that the State elicited inadmissible hearsay from Mallick. Specifically, Prtine points to Mallick's testimony that Ward had told her that "[t]he golden rule of dealing drugs is never take nothing in trade" and her statement that when she questioned Ward about not fighting back after being punched in the face Ward said "[t]here is not a man or woman out there worth going back to jail for [in light of my twin children]." The State concedes that this testimony may have been inadmissible, but again it argues that any error did not affect Prtine's substantial rights. We agree.

As discussed above, Mallick's testimony relating to what Ward said about being punched was brief, isolated, and not repeated. As for Mallick's testimony that Ward would not have taken anything in trade for drugs, her testimony was not the only testimony at trial on that subject. Partyka testified, without objection at trial or challenge in this appeal, that Ward only

owned a small black knife, that he would have known if Ward had another knife, and that Ward never took a knife in trade for drugs. Therefore, we conclude that it is unlikely that either of the claimed hearsay statements had a significant impact on the verdict.

 Prtine also claims that the State committed misconduct during closing argument by intentionally misstating the evidence. At trial, Eric Stookey testified that he had a telephone conversation with Prtine during which Prtine indicated that Prtine had been cheated by a drug dealer that Stookey arranged for Prtine to meet. Stookey testified that during that conversation Prtine told Stookey that "this niggar ripped me off. . . . I'm going to stab every black motherf—ker that come off this business until I figure out who got it." Stookey also testified that Prtine said, "I got my knife. . . . I don't give a f—k. . . . Dude better give me back my money, I'm stabbing every niggar that comes out of this building."

The State then incorporated some of these statements into closing argument by saying:

> Remember Eric Stookey told you that the defendant a week or two earlier had been ripped off down in Duluth on some drugs, and he called him up, and he is pissed, he is angry, and he told him "I'm holding a knife, and if anyone rips me off again, I'm going to kill them."

Prtine contends that the State misstated the evidence when he attributed the words "if anyone rips me off again, I'm going to kill them" to Prtine. While Prtine is correct that in attributing the above statement to him the State misstated the record, our review of the record satisfies us that the misstatement did not have a significant impact on Prtine's substantial rights. First, the distinction between the

actual testimony and the State's characterization of that testimony is subtle and not likely to have influenced the jury. Second, the offending words were brief and not dwelled on, consisting of only 11 words from a 52–page closing argument. Third, the court instructed the jury that counsel's statements were not evidence and that the jurors should disregard any statements as to the evidence that differed from their recollection. *See State v. Johnson*, 616 N.W.2d 720, 728 (Minn.2000) (noting that the jury instruction is a factor in finding that any error in the prosecutor's statement is nonprejudicial); *State v. Ferguson*, 581 N.W.2d 824, 833 (Minn.1998) (observing that the court assumes that the jury follows a district court's instruction); *State v. Washington*, 521 N.W.2d 35, 40 (Minn. 1994) (ruling that jury instructions are relevant to the analysis of misconduct). Finally, the State's reference to Prtine's earlier threat during closing argument was in support of the State's claim that the killing was premeditated. However, the jury acquitted Prtine of first-degree premeditated murder. That acquittal suggests that the misstatement did not influence the jury's decision.

## IV.

Prtine next contends that the district court committed reversible error when, in response to a question from the jury, it told the jury that there was no need to consider lesser-included offenses if the jury found Prtine guilty of a greater offense.

■ A person who is prosecuted for the commission of a crime, but not found guilty, may be guilty of a lesser crime. Minn.Stat. § 609.04 (2008); *see also* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.20 (4th ed. 1999) ("The law provides that upon the prosecution of a person for a crime, if the person is not guilty of that crime, the person may be guilty of a lesser crime."). The comment to CRIMJIG 3.20 cautions courts "not to indicate any order in which the crimes should be considered" and not to "instruct the jury to consider the lesser crimes only if it finds the defendant not guilty of the charged offense." CRIMJIG 3.20 cmt.; *see also State v. Dahlstrom*, 276 Minn. 301, 311, 150 N.W.2d 53, 61 (1967) (concluding that the district court should not instruct the jury with his or her own views on the order of procedures to be followed). Consideration of both the greater-and lesser-included crimes is important because it may cause the jury to evaluate the evidence differently with regard to an essential element. *See State v. Dahlin*, 695 N.W.2d 588, 601 (Minn.2005) (noting that a part of jury deliberations is the jury evaluating whether a lesser-included crime is more appropriate than the greater crime). Thus, it is error for a district court to suggest the order in which the jury should consider the charges.

■ A defendant's failure to object to a jury instruction before they are given to the jury constitutes a waiver of the right to appeal. *State v. Cross*, 577 N.W.2d 721, 726 (Minn.1998). However, a reviewing court can reverse if the instruction constituted plain error. *Griller*, 583 N.W.2d at 740; *State v. Butler*, 295 N.W.2d 658, 659 (Minn.1980).

■ At the close of trial, the district court gave the jury a complete and proper jury instruction that correctly described the elements of each of the charges and lesser-included offenses and did not suggest the order the jury should consider the charges. During deliberations, the jury asked the court the following questions, "If we agree on a higher charge, do we need to rule on the lesser charges? Do we have to vote on all of the charges?

Example: So if we ruled on first degree murder, we wouldn't rule on second degree murder?" After consulting with counsel for Prtine and the State and obtaining an agreement on how to respond, the district court cited the language of CRIMJIG 3.20 regarding lesser-included offenses and instructed the jury generally about the burden of proof and presumption of innocence. However, the district court also instructed the jury that it should proceed "down the line" until it arrived at a guilty verdict and after arriving at a guilty verdict it was not required to consider the remaining offenses. While we conclude that the district court's response to the jury's question constituted error that was plain because the answer suggested the order in which the jury should consider the charges, we also conclude that the error did not affect Prtine's substantial rights.

Considering the jury instructions as a whole, it is apparent that Prtine was not prejudiced by the error such that the error affected the outcome of the case. Prtine concedes that the district court's instruction on the greater first-degree murder charges specifically required the jury to consider the lesser-included offenses of second-degree intentional murder and first-degree manslaughter, but Prtine suggests that the jury instructions did not guide the jury to consider the second-degree felony murder count, which is a lesser-included offense to first-degree felony murder. However, the district court was not required to submit second-degree felony murder as a lesser-included crime because a lesser-included-offense instruction is not warranted when there is no evidence adduced to support acquitting of the greater charge and convicting of the lesser charge. *Dahlin*, 695 N.W.2d at 595.

First-degree felony murder requires intent to kill during the commission of a felony; however, second-degree felony murder does not require a showing of intent. *State v. Dimmick*, 586 N.W.2d 127, 129 (Minn.1998). Prtine's own testimony establishes that Prtine went to Ward's apartment, purchased narcotics, and during a scuffle stabbed Ward multiple times. This uncontroverted evidence establishes the predicate drug sale felony, and a reasonable jury would find that 63 stab wounds are indicative of an intent to kill. *Id.* at 129–30 (finding that a defendant who robbed a victim, stabbed her 35 times, and left her to die is not entitled to a second-degree felony murder instruction because there is no rational basis for a jury to acquit of first-degree felony murder). Because Prtine was not entitled to the second-degree felony murder instruction, telling the jury that it need not consider second-degree felony murder if it found Prtine guilty of first-degree felony murder did not result in prejudice. Therefore, we hold that the error did not affect Prtine's substantial rights.

## V.

Prtine's last claim is that he was denied the effective assistance of counsel when, without his consent, his trial counsel conceded during closing argument that the State had proven intent. In particular, counsel stated:

> The lesser charges are [ ] murder in the second degree. There are two different counts of murder in the second degree. And here Dr. Uncini has furnished one of the key elements. He said that there was definitely an intent to cause death.
>
> ... We understand that in order to raise the defense of self-defense, you have to, first of all, admit that you intentionally caused the death of someone. That's never been missing.

When counsel for the defendant admits a defendant's guilt without the

defendant's consent, the counsel's performance is deficient and prejudice is presumed. *See Dukes v. State,* 621 N.W.2d 246, 254 (Minn.2001); *State v. Wiplinger,* 343 N.W.2d 858, 861 (Minn.1984). The decision to concede guilt is the defendant's decision alone to make. *Dukes,* 621 N.W.2d at 254. If that decision is taken from the defendant, the defendant is entitled to a new trial, regardless of whether he would have been convicted without the admission. *Wiplinger,* 343 N.W.2d at 861. The absence of a personal, on-the-record consent to counsel's strategy of admitting guilt to a lesser charge is not dispositive. *Provost,* 490 N.W.2d at 97. We look at the entire record to determine if the defendant acquiesced in his counsel's strategy. *Hummel v. State,* 617 N.W.2d 561, 565 (Minn.2000); *Provost,* 490 N.W.2d at 97. We have held that when trial counsel uses the same strategy from beginning to end of trial and the defendant does not object, the defendant acquiesces in the admission. *Provost,* 490 N.W.2d at 97. We have also held that the defendant acquiesces when admitting guilt was an "understandable" strategy, he was present at the time the concessions were made, he understood that his guilt was being conceded, and he did not object. *State v. Pilcher,* 472 N.W.2d 327, 337 (Minn.1991). In evaluating whether defense counsel made an improper concession, we first perform a de novo review of the record to see if counsel in fact conceded the defendant's guilt and, if so, we must proceed to the second prong of the inquiry and determine whether the defendant acquiesced in that concession. *Torres v. State,* 688 N.W.2d 569, 573 (Minn.2004).

 Here, counsel's statement that Prtine intentionally caused Ward's death conceded guilt in regard to intent. While this concession may have been a valid strategy to build credibility with the jury and Prtine surely would have been convicted without the concession, "whether or not to admit guilt at a trial is a decision that under our system can only be made by the defendant." *Wiplinger,* 343 N.W.2d at 861. Furthermore, Prtine's counsel did not use the same strategy throughout trial. The concession on the issue of intent was not made until the closing argument and there was no indication before the closing argument that such a concession would be made. Prtine did not object to the concession before the case was given to the jury, but the record is unclear as to whether he acquiesced in the concession. When the record is unclear as to whether the defendant acquiesced in his counsel's concession, we have found a remand to the district court for fact-finding is the appropriate resolution. *See Dukes,* 621 N.W.2d at 255. Because the record is unclear, a remand to the district court is necessary to determine whether Prtine acquiesced. Therefore, while we retain jurisdiction of this direct appeal, we remand this case to the district court to determine if Prtine acquiesced in his trial counsel's concession.

Remanded.

Concurring in part, dissenting in part,
GILDEA, and DIETZEN, JJ.
Concurring in part, dissenting in part,
ANDERSON, PAUL H., J.

GILDEA, Justice (concurring in part, dissenting in part).

I agree with the majority on the evidentiary, misconduct, and lesser-included-offense issues, but I write separately to address two issues on which I part company from the majority's analysis. I disagree with the majority's conclusion that the district court abused its discretion in denying Prtine's challenge for cause of prospective juror J.B. I also disagree with the majority's conclusion that we need to remand the

question of whether Prtine consented to his attorney's concession on intent.

A.

With respect to the challenge for cause, we have recognized that the district court is "in the best position to observe and judge the demeanor of the prospective juror" and as a result, we defer to the court's credibility determinations that support its decision to deny a challenge for cause. *State v. Graham,* 371 N.W.2d 204, 206 (Minn.1985). In the case the majority relies on, *State v. Logan,* we said that the district court's "resolution of the question whether the prospective juror's protestation of impartiality is believable is entitled to special deference." 535 N.W.2d 320, 323 (Minn.1995) (citation omitted) (internal quotation marks omitted). Notwithstanding our deferential standard of review, the majority concludes that the district court erred in determining that J.B. was credible in swearing that she could be a fair and impartial juror. I disagree.

The majority relies on *Logan* in setting aside the district court's credibility determination, but *Logan* was a much different case. In *Logan,* the prospective juror agreed that it would be "virtually impossible" for him to "conclude as a juror that a police officer had testified falsely." *Id.* at 322. In the face of this assertion of near certainty, we concluded that the district court's conclusion that the juror had been rehabilitated was erroneous. Specifically, we said "that the trial court erred in rejecting defense counsel's challenge in this case because the juror did not swear that he *could* set aside any opinion he might hold and decide the case on the evidence, but only that he would *try.*" *Id.* at 324 (citation omitted) (internal quotation marks omitted). The majority concludes that J.B. similarly failed to swear that she "could set aside any opinion [she] might

hold and decide the case on the evidence," and that therefore the district court erred. In my view, the majority misreads the record.

Unlike the juror in *Logan,* J.B. specifically said, in response to the court's questions, that she "could" be "a fair and impartial juror." The court asked: "what we really want to know is whether you believe you could be a fair and impartial juror and participate in a trial of this nature." In response, J.B. said, "I think I could, yes."

The court later asked: "[A] [j]uror's function would be to be unbiased, not have any pre-judgments, to listen to the evidence during the trial. Set aside anything that you may have heard or seen elsewhere, not let that influence you, so you can be a fair and impartial juror. Can you do that?" In response, J.B. said, "I think I can, yes."

Finally, the court asked J.B.: "So as you sit here right now, do you think you could be a fair and unbiased juror?" J.B. answered, "Yes, although a nervous, anxious" juror. In my view, the majority's conclusion that "J.B. never swore that she 'could set aside any opinion [she] might hold and decide the case on the evidence'" cannot be squared with J.B.'s answers to these questions.

I acknowledge that during the questioning, J.B. said that she "would be more inclined to believe" police officers. The court then asked:

But do you think that you can have an unbiased view and not prejudge anybody's testimony until you have heard it, and give it just such open mind and fair consideration as you believe it deserves in the light of all the other evidence, in the light of your own experience and common sense, and after discussing it

with your fellow jurors, that would really be the question?

In response, J.B. said "yes."

Based on J.B.'s testimony as a whole, and giving due deference to the district court's ability to observe her demeanor during her answers to all of the questions posed during voir dire, I would defer to the court's credibility determination that J.B. was truthful when she said she "could" be a fair and impartial juror. I therefore would hold that the court did not abuse its discretion when it denied Prtine's motion to strike J.B. for cause.

### B.

I also disagree with the majority's conclusion that we need to remand this matter for a determination of whether Prtine consented to his counsel's concession on the question of intent. Prtine alleges that he received ineffective assistance of counsel because, in closing argument, his lawyer admitted "that you intentionally caused the death of someone [has] never been missing" from the case. The majority concludes that this admission was one of guilt and that unless Prtine consented to this admission, his counsel was ineffective. I disagree.

I would hold that counsel did not concede Prtine's guilt. As the majority notes, Prtine's defense at trial was not that he did not kill Ward. Rather, Prtine's contention was that he killed Ward in self-defense. As the majority also notes, "[w]hether one is justified in using deadly force is an objective inquiry ... not an evaluation of the defendant's subjective state of mind." Moreover, as the majority also correctly concludes, "a criminal defendant's subjective intent to kill does not negate a self-defense claim." Because counsel's statement conceded at most a subjective intent to kill and Prtine's self-defense claim was not negated thereby, I would hold that counsel did not admit Prtine's guilt. A remand to determine whether Prtine consented therefore is not necessary.

DIETZEN, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Gildea.

ANDERSON, PAUL H., Justice (concurring in part, dissenting in part).

I join in part B of Justice Gildea's concurrence and dissent.

ANDERSON, PAUL H., Justice (concurring in part, dissenting in part).

I join in the opinion of the majority except for Part V. With respect to Part V, I dissent and in doing so join in Part B of Justice Gildea's dissent.