*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1999**

State of Minnesota,
Respondent,

vs.

Jaylin Deshawn Dubose,
Appellant.

**Filed November 9, 2015
Affirmed
Peterson, Judge**

Hennepin County District Court
File No. 27-CR-12-17804

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Lee W. Barry, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Frederick J. Goetz, Goetz & Eckland P.A., Minneapolis, Minnesota (for appellant)

Considered and decided by Smith, Presiding Judge; Peterson, Judge; and Stauber, Judge.

**U N P U B L I S H E D   O P I N I O N**

**PETERSON**, Judge

In this appeal from his conviction of second-degree unintentional murder, appellant argues that (1) the evidence was insufficient to support the conviction, and

(2) the district court erred in granting the state's motion to dismiss a prospective juror for cause. We affirm.

## FACTS

K.H. lived in Minneapolis at 1715 Irving Avenue North. During the evening of June 5, 2012, K.H. walked to a convenience store a few blocks from his home. When K.H. was on his way home, his mother, P.H., drove by and stopped to give him a ride the rest of the way home. When they got to their house, P.H. parked the car in the garage behind the house and K.H. walked through the house to the front door, went outside, and sat on the front steps and smoked a cigar. While K.H. was sitting on the front steps, two of his friends, E.T. and R.A., stopped by. E.T. and R.A. had been walking south along Irving Avenue with appellant Jaylin Deshawn Dubose, but Dubose had fallen behind. While K.H., E.T., and R.A. were in front of K.H.'s house, they saw a car drive by on Irving Avenue heading north toward 18th Avenue.

K.F., C.W., and P.G. were passengers in the car, and L.W. was driving. While stopped at a stop sign on Irving Avenue North and 18th Avenue, L.W. heard P.G. say, "Oh, he's going to shoot." L.W. heard shots, put his head down, and tried to pull away. But the car had gone into neutral, so the engine just revved. L.W. quickly shifted into drive and pulled away. As L.W. pulled away, P.G. said, "I'm hit."

Within about two blocks, L.W. saw a police car pulled over to conduct a traffic stop. Minneapolis Police Officer Richard Taylor, who was conducting the traffic stop, heard someone yell for help and saw three males getting out of L.W.'s car. Within a few seconds, Taylor went to the car to provide assistance. Taylor called for rescue and an

2

ambulance. P.G. died before paramedics arrived. The car's occupants did not know who had done the shooting and did not indicate a motive for it.

When K.H. heard the sound of shots coming from the north, he looked toward 18th Avenue and saw the car that had just passed by his house. He also saw Dubose running south on Irving Avenue. K.H. did not see anyone other than Dubose on that block.

E.T. took off when the shots were fired. P.H. heard the gunshots and ran outside. She saw K.H. and R.A. sitting on the front steps and Dubose running through her neighbor's yard. Dubose said that someone was shooting. R.A. left, and K.H., P.H., and Dubose went inside the house. K.H. and Dubose went into the basement.

Early the next morning, a search warrant was executed on the basement of K.H.'s house. The following items were seized: a plastic bag that was hidden above the laundry-room ceiling and contained a firearm with a magazine and three live Fiocchi nine-millimeter Luger cartridges; a paper towel in the bag with the firearm and live cartridges; a bottle of isopropyl alcohol sitting out near the laundry tub; a black ammunition tray found under a couch; live Fiocchi nine-millimeter Luger cartridges found in the sitting room and under the staircase; a box for Fiocchi nine-millimeter Luger ammunition found by a pipe access in the basement; and a torn piece of an ammunition box found in a brass-and-glass hutch in the basement. The paper towel in the plastic bag with the firearm was damp when police discovered it. K.H.'s fingerprints were found on the ammunition box and tray. Discharged cartridge casings found at the shooting scene had markings that an

expert testified were consistent with having been fired from the firearm found in the basement.

Dubose was charged with one count of second-degree intentional murder in violation of Minn. Stat. § 609.19, subd. 1(1) (2010). The case was tried to a jury. K.H. testified at trial that he saw Dubose fire the shots at the car. Previously, in statements to police, K.H. stated that he had not seen the shooting. K.H. also testified that Dubose showed him the gun when they got into the basement; he had seen the gun before in his house but had not previously seen Dubose with it; the gun did not belong to him and a friend might have left it in his house; Dubose was a friend who came to K.H.'s house on a fairly regular basis; and, after Dubose showed him the gun, K.H. got rubbing alcohol and wiped down the gun, the magazine, and the bullets. E.T. stated to police and testified at trial that after the shooting, Dubose said that he shot at the car because it was "driving janky."

The jury found Dubose guilty of the lesser included offense of second-degree unintentional murder. This appeal followed sentencing.

**DECISION**

**I.**

When considering a claim of insufficient evidence, this court conducts "a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction," was sufficient to allow the jurors to reach the verdict that they reached. *State v. Caine,* 746 N.W.2d 339, 356 (Minn. 2008) (quotation omitted). We must assume that "the jury believed the State's witnesses and disbelieved

the defense witnesses." *State v. Tscheu,* 758 N.W.2d 849, 858 (Minn. 2008). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the crime charged. *Bernhardt v. State,* 684 N.W.2d 465, 476-77 (Minn. 2004).

Dubose argues that the evidence was insufficient to support his conviction because the only direct evidence that he was the shooter was uncorroborated accomplice testimony and the remainder of the evidence was circumstantial evidence that was consistent with rational hypotheses other than his guilt. Accomplice testimony must be "corroborated by such other evidence as tends to convict the defendant of the commission of the offense." Minn. Stat. § 634.04 (2014). Accomplice testimony may not be corroborated solely by the testimony of another accomplice. *State v. Pederson*, 614 N.W.2d 724, 733 (Minn. 2000).

A jury instruction about the need for corroboration of accomplice testimony "must be given in any criminal case in which any witness against the defendant might reasonably be considered an accomplice to the crime." *State v. Lee*, 683 N.W.2d 309, 316 (Minn. 2004) (quotation omitted). A witness is considered an accomplice if the witness could have been charged with and convicted of the crime with which the defendant was charged. *State v. Pendleton*, 759 N.W.2d 900, 907 (Minn. 2009). The district court may determine as a matter of law whether a witness is an accomplice if the facts are undisputed and there is only one inference to be drawn, but the determination is one of fact for the jury if the evidence is disputed or susceptible to different

5

interpretations. *Holt v. State*, 772 N.W.2d 470, 483-84 (Minn. 2009). An accessory after the fact is not an accomplice. *State v. Henderson,* 620 N.W.2d 688, 701 (Minn. 2001); *see also State v. Pietraszewski,* 283 N.W.2d 887, 892 (Minn. 1979) ("In the instant case there is no evidence that [the witness] had any involvement with the crime before he hid the gun and ammunition. At most he can be considered an accessory after the fact.").

Dubose's argument that the evidence was insufficient assumes that both K.H. and E.T. were accomplices. But the district court instructed the jury to determine whether any witness was an accomplice and that accomplice testimony required corroboration. We presume that the jury followed the district court's instructions. *State v. Taylor*, 650 N.W.2d 190, 207 (Minn. 2002). And this court must view the evidence in the light most favorable to the verdict and assume that the jury resolved all factual disputes in the state's favor. Applying that standard, the evidence supports a finding that K.H. and E.T. were accessories after the fact and not accomplices. Because K.H. and E.T. were not accomplices, their testimony did not require corroboration.

Dubose's only insufficiency-of-the-evidence argument is that the testimony required corroboration. He does not argue that if corroboration was not required, K.H.'s and E.T.'s testimony was insufficient to support his conviction. Nonetheless, we have carefully reviewed the record, and, viewing the evidence in the light most favorable to the verdict, the evidence was sufficient to support the conviction.

**II.**

Dubose argues that the district court abused its discretion when it dismissed prospective-juror C.G. for cause. Dubose contends that "the state failed to prove that

C.G. expressed a state of mind demonstrating actual bias." A juror may be challenged for cause if "[t]he juror's state of mind—in reference to the case or to either party—satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the challenging party." Minn. R. Crim. P. 26.02, subd. 5(1)(1). "[T]he challenging party has the burden of proving that the juror expressed a state of mind demonstrating actual bias towards the case or either party." *State v. Munt,* 831 N.W.2d 569, 577 (Minn. 2013) (quotations omitted).

"When a juror expresses such a state of mind, the district court must either excuse the juror for cause" or rehabilitate the juror. *State v. Prtine,* 784 N.W.2d 303, 310 (Minn. 2010) (quotation omitted). "A prospective juror may be rehabilitated" if, after "instructions and additional questions" from the district court, "the juror states unequivocally that he or she will follow the district court's instructions and will set aside any preconceived notions and fairly evaluate the evidence." *Id.* (quotation omitted).

Appellate courts defer "to the district court's ruling on challenges for cause" because "the question of whether a juror is impartial is a credibility determination." *Id.* Appellate courts review for-cause dismissals for abuse of discretion. *Munt,* 831 N.W.2d at 576.

> To establish that the prospective juror expressed actual bias, the challenging party must identify more than the mere existence of any preconceived notion as to the guilt or innocence of an accused. Rather, the challenging party must show that the juror exhibited strong and deep impressions that would prevent her from laying aside her impression or opinion and rendering a verdict based on the evidence presented in court.

*Id.* at 577 (quotations and citation omitted). A juror's challenged answer must be viewed in the context of the juror's entire voir dire testimony. *Id.* at 578.

The jury questionnaire asked, "Is there any reason why you think you might have difficulty being completely impartial in this case . . . ?" C.G. answered "[y]es" to this question and wrote in explanation, "This is a [difficult] question for me; the kid [Dubose] looks like my sons." When the district court asked C.G. whether this response indicated bias, C.G. replied:

> I'm not sure if I'd be biased for or not, but it's kind of difficult to see somebody that looks sort of like my kids sitting right there. So then it makes me reflect on my kids and being in this circumstance. So that's why it's a difficult question for me.

When the district court asked whether C.G. was concerned about his judgment being influenced because he identified with one side or the other, C.G. replied: "I can't change my background and who I am and where I came from nor my kids or anything like that. So that all influences my decision." C.G. stated that he could compartmentalize and make a decision based solely on what he saw and heard in the courtroom. But he also stated that thinking about his son being in Dubose's situation had caused him to have trouble sleeping the previous night and that he did not know how those thoughts would affect his decision-making.

C.G. also said that he has had several unpleasant experiences with Minneapolis police officers, particularly when he returned home from a vacation and found that his house had been burglarized. C.G. stated that when he reported the burglary, the responding officers treated him like a suspect, rather than a crime victim. C.G. also felt

8

that he had been treated unfairly when stopped for possible traffic violations, and he explained that he had been handcuffed when stopped for speeding and subjected to threatening conduct or questioning on many occasions. There was also an incident when police wanted to take his sons to jail to teach them a lesson because they had B.B. guns, and C.G. did not believe that was appropriate.

The questionnaire asked, "Is there anything about your experiences with law enforcement that would cause you to be biased either for or against the State of Minnesota . . . ?" C.G. answered "[y]es" and wrote in explanation, "Based on how I've been treated as a law-abiding citizen." C.G. stated to the court that it was accurate to interpret his answer as indicating a possible bias against the state. The court then said, "Okay. And you don't think that you would be biased against the defendant?" C.G. responded:

> No, I don't think I'd be biased against anyone actually. I mean, I -- I did my best. Well, I did tell the truth on the questionnaire as asked, so that's how I see and interpret the information. So, as far as being biased, I -- I guess I could be biased.

In granting the state's motion to excuse C.G. for cause, the district court stated:

> [I]t's the Court's experience that quite often we get some rather honest answers to questions in a questionnaire that we may not get in a courtroom and people will quite often admit bias in a questionnaire that they'll have difficulty admitting in a courtroom when questioned by the attorneys, and the Court is of the opinion that those unfiltered answers are probably the most reliable answers in the process because jurors quite often say what we want them to say when they are led or artfully asked questions, either by the court or by counsel.

9

And it's the Court's opinion that the answers that were provided by [C.G.] in the questionnaire not only express the potential for his identifying with [Dubose], but they outright contain admissions of bias against police and against the State.

I would note that when questioned by the Court, [C.G.] admitted, when allowed to review his answers to his specific answers to the questions asked in the questionnaire, I believe what he said was, I guess that makes me biased, and he said it almost realizing that in the courtroom.

Now, I understand that when questioned artfully by [defense counsel], his answers changed somewhat, but I believe his original answers to the questions are the most reliable and those answers were reinforced by his own admission that he was biased against the State.

Citing *State v. Riddley*, Dubose argues that the reasons for C.G.'s bias did not warrant granting a challenge for cause. *See* 776 N.W.2d 419, 428-30 (Minn. 2009) (upholding dismissal of juror for cause when juror's brother had been shot by police officer and prosecutor was also the prosecutor in a case against juror's son). The fact that the *Riddley* juror may have had stronger reasons for bias does not mean that the district court abused its discretion in dismissing C.G. for cause. Although at times C.G. stated that he could be fair, he also admitted that he had biases. In *State v. Bowers*, in rejecting the argument that a prosecutor's challenge for cause was racially motivated, the supreme court stated:

Defendant points out two facts that, he claims, suggest the prosecutor acted with racially discriminatory motives. First, although the juror admitted biases, she also said she could be fair. We find this argument to be without merit. The juror admitted that the presence of alcohol in the case would make it difficult for her to be fair. She said she could not disregard her personal experiences with an alcoholic father

10

nor could she judge appellant fairly. Because of a bad experience with police officers, she stated she would give lesser weight to their testimony. Although defendant's counsel slightly rehabilitated the juror about her ability to put aside her feelings on alcohol, the juror nevertheless seemed tentative and unconvinced, and the juror never swayed in her bias against police officers.

482 N.W.2d 774, 776-77 (Minn. 1992).

C.G. candidly explained to the district court his state of mind. His explanation included conflicting statements about his ability to impartially judge the case. C.G. stated that he could be impartial, but he also acknowledged that because of the way he has been treated by police as a law-abiding citizen, he could be biased. The district court's explanation of its decision to grant the state's motion to excuse C.G. for cause demonstrates that the court considered all of the information that C.G. provided. In light of the conflicting information presented to the district court and because the question of a juror's impartiality is a credibility determination, we conclude that the court did not abuse its discretion when it granted the state's motion. C.G.'s acknowledgment that he could be biased was not an unequivocal statement that he would set aside any preconceived notions and fairly evaluate the evidence.

**Affirmed**.